

**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JAN 3 0 2009

Mayor Michael R. Bloomberg
City Hall
New York, NY   10007

    Re:  <u>CRIPA Investigation of Kings County Hospital Center</u>

Dear Mayor Bloomberg:

    We are writing to report the findings of the Civil Rights
Division and the United States Attorney's Office for the Eastern
District of New York regarding our joint investigation of
conditions and practices at the inpatient psychiatric units and
psychiatric emergency room at Kings County Hospital Center
("KCHC") located in Brooklyn, New York.  On December 7, 2007, we
notified you that we were initiating an investigation pursuant to
the Civil Rights of Institutionalized Persons Act ("CRIPA"),
42 U.S.C. § 1997, and a parallel investigation of the KCHC
Hospital Police pursuant to the Violent Crime Control and Law
Enforcement Act of 1994, 42 U.S.C. § 14141 ("§ 14141").  The
Department of Justice is authorized under CRIPA to seek a remedy
for a pattern or practice of conduct that violates the
constitutional or federal statutory rights of patients with
mental illness who are treated in public institutions.  Section
14141 authorizes the Department of Justice to seek a remedy for a
pattern or practice of police misconduct that violates citizens'
constitutional rights.[1]

    As part of our investigation, during the spring, summer and
fall of 2008, we conducted three on-site reviews of care and
treatment at KCHC and of the Hospital Police.  On these tours, we
were aided by expert consultants in the fields of psychiatry,
psychology, psychiatric nursing, protection from harm, life

---

    [1]    Section 14141 does not mandate issuance of "findings."  We
have not, however,  concluded our review of incidents involving the
Hospital Police and therefore have not yet determined whether
Hospital Police are engaging in a pattern or practice of excessive
use of force.

psychology, psychiatric nursing, protection from harm, life
safety, discharge planning and community placement, and hospital
police and security.  While on-site, we interviewed
administrative staff, mental health care providers, hospital
police staff and patients, and examined the physical living
conditions at the facility.  Additionally, before, during, and
after our on-site inspection tours, we reviewed an extensive
array of documents, including policies and procedures, incident
reports, and medical and mental health records.  Consistent with
our commitment to provide technical assistance and conduct
transparent investigations, we concluded our tours with extensive
debriefings at which our consultants conveyed their initial
impressions and concerns to counsel, KCHC administrators and
staff, and City officials.

We appreciate the cooperation we received from the New York
City Health and Hospitals Corporation ("HHC") and the New York
City Corporation Counsel's office.  We also wish to thank the
administration and staff at KCHC for their professional conduct,
their responsiveness to our information requests, and the
extensive assistance they provided during our tour.  Further, we
wish to especially thank those individual KCHC staff members,
both newly appointed and longstanding employees, who make daily
efforts to provide appropriate care and treatment.  Those efforts
were noted and appreciated by the Department of Justice, the
United States Attorney's Office and our expert consultants.  We
hope to continue to work cooperatively with HHC, KCHC and the
City of New York to address the deficiencies found at the
facility.

In accordance with statutory requirements, we now write to
advise you formally of the findings of our investigation, the
facts supporting them, and the minimum remedial steps that are
necessary to remedy the deficiencies set forth below.  42 U.S.C.
§ 1997b(a).

We note, at the outset, however, that conditions at KCHC are
particularly disturbing.  Substantial patient harm occurs
regularly due to KCHC's failure to properly assess, diagnose,
supervise, monitor, and treat its mental health patients.  We are
particularly troubled by the patient death that occurred in June
2008, where a patient was left unattended and died face down on
the floor as staff and security guards ignored her.  Further, we
find that the number of incidents of patient-on-patient
aggression is extraordinarily high and is continuing with little
or no abatement.  Conditions at KCHC are highly dangerous and
require immediate attention.  As a result, we issued three
immediacy letters (see attached) during the course of our

investigation.[2] In the first, dated June 18, 2008, we wrote to express our concerns regarding serious fire safety and sanitation issues in the mental health units. On August 22, 2008, we sent a second immediacy letter, which cited several policies and practices at KCHC which posed imminent risks of serious harm to patients, including inadequate mental health assessments, inappropriate drug combinations, and inappropriate use of drugs solely for their secondary sedative effect. Each of these deficiencies resulted in no treatment, or minimal treatment, for mentally ill patients. We also identified in this letter inadequate care for patients with diabetes, inadequate medical emergency responses due to inadequate supervision and monitoring of patients and poorly trained personnel that contributed to the death of a patient in the psychiatric emergency room, and the falsification of medical records.

We issued a third immediacy letter on November 7, 2008. That letter detailed three recent serious incidents in the inpatient mental health units which posed imminent risk of serious harm to patients. That risk of harm was generated in large part by inadequate, ineffective, and counterproductive treatment and the resulting failure to identify and control patient aggression and to address suicidal ideation and attempts.[3] Actual harm resulted from the incidents described in the letter. In one, a 14-year-old adolescent patient was sexually assaulted by another adolescent patient. In the other, six patients engaged in a brawl which resulted in one patient requiring surgery to fix a fractured finger.

Moreover, in addition to the notice we provided while on-site, KCHC has been on notice for some time of many of the findings we make in this letter, having been notified previously of deficiencies in the mental health service by other agencies. For example, the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, in August 2008, surveyed KCHC and described KCHC's failure to meet federal regulatory standards regarding: (1) protection from harm;

---

[2]    In each of the letters, we noted that we had not yet reached a conclusion as to whether KCHC was engaging in a pattern or practice of violating the constitutional and federal statutory rights of patients, but nevertheless, the issues were being raised at that time due to the imminent risks of serious harm to patients that required immediate attention.

[3]    We note that once notified, KCHC began to take action to address the deficiencies.

-4-

(2) mental health treatment; (3) nursing and health care; and
(4) specialized needs services, resulting in injuries to
patients, including death. See also Denial of Recertification of
KCHC by New York State Office of Mental Health ("OMH") (November
2008) (describing failure to meet state regulatory standards in
protection from harm, mental health treatment, and nursing and
health care); New York State Department of Health ("DOH")
Statement of Deficiencies (July 2008); Joint Commission on
Accreditation of Healthcare Organizations ("JCAHO") Survey
Findings (July 2008); New York State Commission on Quality of
Care and Advocacy for Persons with Disabilities ("CQCAPD") review
(September 2006); OMH survey of KCHC child and adolescent
inpatient psychiatric services (May 2006).

We note also that conditions at KCHC are the subject of a
lawsuit filed by Mental Hygiene Legal Services of New York State
("MHLS"), the Protection and Advocacy agency[4] for the State of
New York (see Hirschfeld o/b/o L.D. et al. v. New York City
Health and Hospitals Corp., et al., Civil Action No. CV-07-1819
(KAM) (E.D.N.Y. May 2, 2007)). This lawsuit challenges
conditions of confinement at KCHC, including staff violence,
failure to provide adequate psychiatric and medical care, the use
of physical and chemical restraints for punishment, and physical
conditions. In addition, the news media has reported on
conditions at KCHC.[5] Throughout this letter, we include specific
references to past findings by these entities, where
appropriate.[6]

---

[4] The Protection and Advocacy ("P&A") system is a nationwide
network of federally mandated disability rights agencies. In each
State and through a national office, these organizations are
required by law to pursue legal, administrative, and other
appropriate remedies to protect and advocate for the rights of
persons with disabilities. 42 U.S.C. § 10801. Mental Hygiene Legal
Services is a duly authorized agency of the State of New York and is
responsible for providing protection and advocacy services for
individuals receiving services for mental disabilities. N.Y. Mental
Hygiene Law Article 47.

[5] See, e.g., John Marzulli, Brooklyn Psych Ward a Snake Pit,
N.Y. Daily News, Dec. 16, 2008.

[6] In addition to surveys of KCHC by federal and state
regulatory agencies, we also reviewed a self-initiated survey of
KCHC's mental health facilities by Caldwell Management Associates.
The August 2007 findings and recommendations of the consulting group
reflected similar and often identical concerns.

-5-

# I.  BACKGROUND

KCHC is a public acute care hospital operated by HHC, a
public benefit corporation created by New York State legislation
in 1970 to oversee the public health system throughout the five
boroughs of New York City.[7]  The psychiatric facility at KCHC
consists of:  (1) a dedicated psychiatric emergency department,
with a maximum capacity of 25 patients, as well as six Extended
Observation Beds, known as the Comprehensive Psychiatric
Emergency Program ("CPEP"); (2) a 160-bed adult inpatient unit;
and (3) a 46-bed child and adolescent inpatient unit.  For
purposes of this findings letter, "KCHC" refers to only these
three units, although the hospital itself provides a full range
of other medical services.

# II.  LEGAL STANDARDS

The Fourteenth Amendment Due Process Clause requires state
mental health care facilities to provide patients with "adequate
food, shelter, clothing, and medical care," along with conditions
of reasonable care and safety, reasonably nonrestrictive
confinement conditions, and such treatment as may be reasonable
in light of their constitutionally-based liberty interests.
Youngberg v. Romeo, 457 U.S. 307, 315, 319, 322, 324 (1982); see
Woe v. Cuomo, 638 F. Supp. 1506, 1516 (E.D.N.Y. 1986)("[t]he
involuntarily committed patient has a right to decent and humane
conditions") reversed on other grounds, 801 F.2d 627 (2d Cir.
1986); see also P.C. v. McLaughlin, 913 F.2d 1033, 1044 (2d Cir.
1990) quoting Doe v. New York City Department of Social Services,
649 F.2d 134, 141 (2d Cir. 1981)("[t]he law makes clear that
'[w]hen individuals are placed in custody or under the care of
the government, their governmental custodians are sometimes
charged with affirmative duties, the non-feasance of which may
violate the constitution'"); Society for Good Will to Retarded
Children, Inc. v. Cuomo, 737 F.2d 1239, 1245, 1247 (2d Cir.
1984).

---

[7]     HHC provides medical, mental health and substance abuse
services through its 11 acute care hospitals, which include Kings
County Hospital Center, four skilled nursing facilities, six large
diagnostic and treatment centers and more than 80 community based
clinics.  HHC Health and Home Care division also provides home
health care services, including nursing, physical therapy, speech
pathology, personal care, and housekeeping services.  HHC is a $5.4
billion corporation, the largest municipal hospital and health care
system in the country, and serves 1.3 million New Yorkers, nearly
400,000 of whom are uninsured.

-6-

Treatment is not adequate if it substantially departs from accepted professional judgment, practice, or standards. <u>Youngberg</u>, 457 U.S. at 320-23. Patients have a due process right to have all major decisions regarding their treatment made in accordance with the judgment of qualified professionals acting within professional standards. <u>Messier v. Southbury Training School</u>, 562 F. Supp.2d 294, 301 (D. Conn. 2008); <u>see also</u> <u>Hughes v. Cuomo</u>, 862 F. Supp. 34, 37 (W.D.N.Y. 1994).

In addition, patients' constitutional right to reasonable safety compels public entities to provide reasonable protection from harm in mental health hospitals. <u>Youngberg</u>, 457 U.S. at 315-16. The Due Process Clause requires individualized treatment that will give patients "a reasonable opportunity to be cured or improve [their] mental condition." <u>Donaldson v. O'Connor</u>, 493 F.2d 507, 520 (5th Cir. 1974), <u>vacated</u> <u>on other grounds</u>, <u>O'Connor v. Donaldson</u>, 422 U.S. 563 (1975). Public entities are also compelled by the Constitution to ensure that patients are free from hazardous drugs which are "not shown to be necessary, used in excessive dosages, or used in the absence of appropriate monitoring for adverse effects." <u>Thomas S. v. Flaherty</u>, 699 F. Supp. 1178, 1200 (W.D.N.C. 1988), <u>aff'd</u>, 902 F.2d 250 (4th Cir. 1990). "Even on a short-term basis, states may not rely on drugs to the exclusion of other methods to treat people with behavior problems." <u>Id.</u> at 1188. Further, it is a substantial departure from professional standards to rely routinely on seclusion and restraint rather than behavior techniques, such as social reinforcement, to control aggressive behavior. <u>Thomas S.</u>, 699 F. Supp. at 1189. Seclusion and restraint should be used only as a last resort. <u>Id.</u>

Federal Medicare/Medicaid regulations governing certified psychiatric hospitals, such as KCHC, also require adequate staffing, record keeping, care, treatment, and discharge planning. 42 C.F.R. §§ 482-483.

Finally, KCHC must provide services to qualified individuals with disabilities in the most integrated setting appropriate to their needs. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"), and its implementing regulations, 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities"); <u>see</u> <u>Olmstead v. L.C.</u>, 527 U.S. 581 (1999).

-7-

III.  **FINDINGS**

Significant and wide-ranging deficiencies exist with respect to KCHC's provision of care to its mental health patients. Certain conditions and services at KCHC substantially depart from generally accepted professional standards, and therefore violate the constitutional and federal statutory rights of patients who reside there.

A principal example of KCHC's failure to provide care consistent with generally accepted professional standards is the well-publicized collapse and death of 49-year-old patient Esmin Green.[8]  Ms. Green was admitted to the CPEP on June 18, 2008. She remained there for almost 24 hours, without a bed, until approximately 5:30 a.m. on June 19, 2008.  At that time, she collapsed from her chair and lay prone on the floor, limbs askew. She remained face down on the floor for approximately one hour without any attention from staff.

During that hour, surveillance video shows that several staff members, including one doctor and two Hospital Police officers, entered the waiting area, appeared to observe Ms. Green lying on the floor, and then left without offering any assistance.  In addition, although the video image was broadcast to surveillance monitors, the monitors' images were either ignored or unwatched by staff.

Although Ms. Green can be observed on the surveillance video moving occasionally while she lay on the floor, she appears to have died before a medical code was called.  When staff responded to the code, the surveillance video shows a disorganized, and largely medically inappropriate, emergency response.  Further, after the incident, it was discovered that medical documents regarding the circumstances of Ms. Green's death had been falsified.[9]

While perhaps unique in the extent of the harm that resulted, the tragic case of Ms. Green typifies the patterns of inadequate care and treatment of patients at KCHC.  In particular, we find that KCHC:  (1) fails to adequately protect its patients from harm; (2) fails to provide adequate mental health care; (3) fails to provide adequate behavioral management

---

[8]     We use Ms. Green's full name herein because the circumstances surrounding her death are matters of public record.

[9]     We describe different aspects of KCHC staff's handling of Ms. Green's collapse and death throughout this letter.

-8-

services; (4) fails to provide adequate medical and nursing care;
(5) has inadequate quality management practices; (6) fails to
provide a safe physical environment; (7) has inadequate clinical
leadership; and (8) fails to adequately develop discharge plans.
Many of these deficiencies stem from a system that has neither
clear, specific standards of care nor an adequately trained
supervisory, professional, and direct care staff.

A.    Inadequate Protection From Harm

     Patients at KCHC have a right to live in reasonable safety.
See Youngberg, 457 U.S. at 315-16, 322.  Generally accepted
professional standards require that facilities appropriately
monitor and supervise patients in order to ensure their
reasonable safety.  KCHC fails to provide a living environment
that complies with this constitutional mandate or generally
accepted professional practices.  There are widespread patient-
against-patient assaults and unchecked self-injurious behaviors.
In addition, the housing units contain environmental hazards,
some of which pose risks of serious injury, illness, and death.
The harm KCHC patients experience as a result of these
deficiencies is multi-faceted, and includes physical injury;
psychological harm; excessive and inappropriate use of
restraints; inadequate, ineffective, and counterproductive
treatment; and frequent re-admissions leading to excessive
hospitalizations.  The facility's ability to address this harm is
hampered by inadequate incident management and quality assurance
systems.

     In addition, KCHC's policies and practices with respect to
monitoring and supervising patients in its custody, especially
patients assessed to be at risk, are inappropriate, ineffective,
and often cause patient harm.  As discussed below, KCHC largely
uses close ("one-to-one") observation and physical and chemical
restraints to control patients who exhibit dangerous behavior,
often to the exclusion of techniques which are less intrusive,
less harmful, and often more effective.  The frequency and extent
of use of these measures also is inappropriate.

     1.    Failure to Control Patient Aggression and Assaultive
           Behaviors

     Patient aggression is not adequately controlled on many of
the units at KCHC.[10]  Indeed, physical and sexual assaults are

_____

     [10]   We notified counsel for KCHC of our concerns about patient
aggression and assaultive behaviors not being adequately controlled
in our November 7, 2008 immediacy letter.

-9-

not uncommon at KCHC. Several recent incidents reported to us by KCHC counsel are illustrative:

- On September 25, 2008, two 14-year-old youths, A.Z. and B.Y., engaged in reportedly consensual anal and oral sex in the room of a third patient, C.X., even though both B.Y. and A.Z. were supposed to be checked every fifteen minutes by staff.[11] The next morning, A.Z. was assaulted by a 16-year-old youth, E.V., who allegedly forced A.Z. to engage in oral sex with him. E.V. was reportedly assigned to constant one-to-one supervision by KCHC staff. Notably, staff learned of their activity only after another patient disclosed the information two days after the first event.[12]

- On October 15, 2008, six patients on Unit G-41, all on different levels of observation, engaged in a brawl. One of the patients, D.W., sustained an injury to his forehead and a compound fracture of his thumb which required surgery.

- On August 21, 2008, staff discovered a male patient standing in the activity room of Unit G-33 behind a female patient, F.A., engaged in sexual intercourse. During patient interviews by staff following the incident, the female patient reported that she had not consented to the sex. The male patient was arrested and charged with rape.

- On November 22, 2008, patient G.B., an 18-year-old male patient with mental retardation and autism, was admitted to the CPEP. On November 30, 2008, eight days later, he remained in the CPEP.[13] On that date G.B. was found

---

[11] As we noted in our November 7, 2008 immediacy letter, although the medical records described this sexual behavior as consensual, we believe this classification is questionable given the ages of the boys and their mental status.

[12] To protect the patients' identities, we use fictitious initials throughout this letter. We will separately transmit to counsel a schedule cross-referencing the fictitious initials with the patients' names.

[13] We note that the length of this patient's stay in the CPEP violates the New York State Mental Hygiene Law and the Preliminary Injunction Consent Order dated July 2, 2008 issued by United States District Judge Kiyo A. Matsumoto in the Hirschfeld action. Section 9.40 of the New York State Mental Hygiene Law prohibits a hospital from keeping a patient in a CPEP for more than 24 hours without either an assignment to one of the six Extended Observation beds in the CPEP, or admission to one of the inpatient units.

-10-

kneeling in a restroom in the CPEP in front of another male patient, apparently performing oral sex.  From the reports we have received, G.B. did not consent to the sex; indeed, he may not have had the mental capacity to consent.

In each of the incidents described above, our review of incident reports and patient records indicated that staff failed to properly monitor patients and failed to proactively address potentially aggressive behavior.  This problem requires immediate attention.[14]

2.   Failure to Protect Patients Expressing Suicidal Ideation and Attempting Self-Harm

A significant number of patients are admitted to KCHC for stabilization and protection because of suicidal ideation or suicide attempts.  Our review reveals a troubling number of such patients who nonetheless obtained the means to attempt suicide and/or who inflicted serious self-harm.[15]

The medical record of one of the youths involved in the sexual incident which occurred on September 25 and 26, 2008, is illustrative of the problem.  A.Z., a 14-year-old youth, was assessed on admittance as being "suicidal."  He had a history of six previous psychiatric admissions at KCHC, most recently from March to May 2008.  A.Z.'s medical record details a history of A.Z. threatening to hurt himself, including threats to end his life.  His most recent admission, on August 21, 2008, lists "aggressive and impulsive behaviors" and "danger to himself and others" as the reason for his admission to KCHC.

_____

the CPEP, or admission to one of the inpatient units.

[14]    KCHC informs us that it has recently instituted a new "Violence Reduction Program" ("VRP").  The VRP fails to promote an understanding of the etiology of the violent behavior or to guide the treatment of aggressive patients accordingly.  Instead, it focuses on patient self-management skills and serves as an advance directive regarding medications that might be used pro re nata ("PRN") or "as needed" as opposed to regularly scheduled medications.  Violence prevention is not integrated into routine assessment, reassessment, and treatment planning.

[15]    We notified counsel for KCHC of these serious concerns in our November 7, 2008 immediacy letter.

-11-

On September 21, 2008, A.Z. was involved in a physical altercation with E.V., the 16-year-old patient who would later sexually assault him. No actions or changes were made to his treatment plan[16] until the next day, when A.Z. was placed on constant one-to-one observation.[17] Later that day, September 22, 2008, A.Z. attempted suicide by wrapping a video game controller wire around his neck.

On September 25, 2008, A.Z. was taken off constant one-to-one observation and placed on 15-minute observation. Although generally accepted professional standards require that such a change in status, including the rationale for the change, be documented in the patient's medical record, there is no such explanation in the chart. That same day, September 25, 2008, A.Z. was involved in the sexual incident described above. The following day, September 26, 2008, E.V. forced A.Z. to engage in sexual conduct with him.

On September 27, 2008, after KCHC officials learned of the sexual incidents, A.Z. was again placed on constant one-to-one observation. Later that same day, A.Z. again attempted to kill himself by wrapping a video game controller wire around his neck. The incident reports state merely that the patient was upset due

_____

[16]    A treatment plan is essentially a detailed roadmap of a patient's entire course of treatment. Generally accepted professional standards require that an adequate treatment plan be developed under the direction of the treating psychiatrist, with input from all disciplines involved in the treatment of the patient, as well as from the individual patient. The treatment plan should contain, at a minimum: (1) an accurate diagnosis based on adequate assessments conducted by all relevant clinical disciplines; (2) a list of problems caused by the patients' illnesses; (3) clearly articulated goals for the patient, designed to ameliorate problems and promote functional independence; (4) a list of appropriate interventions to guide staff in helping the patient achieve his or her stated goals; and (5) ongoing assessments and, as warranted, revision of the treatment plan. See Section III.B.2 infra for a more detailed discussion of treatment planning issues.

[17]    Constant one-on-one observation is a form of supervision in which a staff member must continually keep a patient in view. DOH's July 2008 survey and CMS' August 2008 survey note several incidents in which patients classified as suicidal appeared to be unsupervised in the CPEP for hours. No evidence could be found showing contact between the suicidal patients and physician or nursing staff eleven to twelve hours after admission.

-12-

to a "previous incident earlier that day" but fails to describe or analyze the assault incidents, note the fact that patient was on constant observation, or that the patient had previously attempted suicide.

Moreover, our review of recent KCHC reports and incidents revealed several other incidents of attempted suicide, some of which occurred while patients were on constant one-on-one observation. Examples include:

• H.C., a patient diagnosed with "psychosis NOS" and "rule out schizoaffective disorder,"[18] began cutting herself with a paper clip and then swallowed the clip the morning of May 28, 2008, while under close observation. Later that day, while under constant one-to-one observation, H.C. was observed tying a torn hospital gown around her neck. The gown was taken away by staff and H.C. walked away, took staples from a desk and then swallowed the staples in the presence of staff. Both incidents were not labeled as a suicide attempt but rather as a "minor self-inflicted injury." Her record reflects no change in her treatment plan. Changes to the treatment plan are necessary when these types of incidents occur, to eliminate or address the self-destructive behavior.

• I.J. is a 47-year-old male with a history of drug abuse who was brought to the CPEP on August 7, 2008 for psychiatric evaluation after reports were received that he was suicidal. I.J. was subsequently admitted to the adult inpatient

_____

[18]    "Psychosis NOS" means "psychosis, not otherwise specified." This means that the patient's symptoms fit within a general diagnosis of psychosis (a severe mental disorder that involves a profound loss of contact with reality, including delusions and hallucinations), but that the evaluating physician is unable to come up with a more specific diagnosis based on the patient's symptoms. "Rule out schizoaffective disorder" is not an official diagnosis, but rather a directive to assess the patient for symptoms of schizoaffective disorder in order to eliminate it, or "rule it out," from the list of possible diagnoses. (Schizoaffective disorder is a disorder in which a patient exhibits symptoms of two diseases at once:  (1) a mood disorder, such as depression; and (2) schizophrenia, which is a complex collection of symptoms persisting over time that include delusions, hallucinations, disorganized speech and behavior, etc. See Section III.B.1 infra for further discussion of the problems associated with "NOS" and "rule out" diagnoses.

service and was placed on constant one-to-one suicidal observation.  On August 11, 2008, I.J. attempted to tie a sheet around his neck and kill himself.  Although the staff member assigned to the one-to-one observation ultimately intervened and removed the sheet, no action was taken to prevent the patient from tying the sheet around his neck in the first instance.  During a post incident interview, I.J. stated that "he wanted to take his life."  A subsequent review by the Special Incident Review Committee (October 2, 2008) concluded that the patient was appropriately monitored and that staff intervention was immediate and accordingly closed the case with no recommendations for further actions.

The repeated and significant level of both aggressive and self-injurious behavior on the units suggests a fundamental failure to address the root causes of patients' inappropriate behavior and demonstrates that KCHC fails to intervene adequately to prevent future incidents.  Moreover, despite the overuse of close observation noted in Section III.C.1 _infra_, these incidents highlight the inadequate oversight and monitoring of those with aggressive or self-injurious behavior.

### 3.   Inadequate Incident Management and Recordkeeping

Generally accepted professional standards require that facilities have transparent and effective systems for identifying, tracking, and correcting problems, adverse events, faulty treatment, and staff adherence to policies and procedures. To protect its patients, KCHC should have in place an incident management system that helps to prevent incidents and ensures appropriate corrective action when incidents do occur.  An effective incident management system consists of several elements, including accurate reporting, thorough investigations, tracking, trending, analysis of data, and implementation and monitoring of effective corrective and/or preventive actions. The incident management system at KCHC falls significantly short of these standards.[19]  As a result, patients continue to be The exposed to actual and potential harm.

---

[19]    As noted above, CMS, OMH, and DOH cited KCHC for its lack of adequate incident management and review systems.  Specifically, in its August 2008 survey, CMS cited KCHC for failing to analyze data collected regarding adverse patient events.  OMH's November 2008 letter finds KCHC noncompliant with standards requiring, inter alia, identification of "patterns and trends through the compilation and analysis of incident data" and reviewing "patterns and trends to identify appropriate preventive or corrective action."  This is a repeat citation by OMH from its May 2007 survey.  Finally, DOH also cited KCHC for the same problem in its July 2008 survey.

In addition, we note that KCHC's incident investigations are inadequate.  The documentation of investigations that we have reviewed is cursory, incomplete, and lacks critical information necessary to address clinical deficiencies.  Further, we found no documentation or other evidence to indicate that KCHC systematically tracks staff adherence to policies and procedures, such as use of one-to-one observation and chemical or physical restraints.  Similarly, we found no evidence that adverse events, such as use of Code Orange calls (KCHC terminology for calling for emergency assistance) or staff or patient injuries, are uniformly tracked and that corrective actions are taken where needed.

## B.    Failure To Provide Adequate Mental Health Care

KCHC patients have a constitutional right to receive adequate mental health treatment.  Donaldson, 493 F.2d at 520. The mental health services at KCHC, however, substantially depart from generally accepted professional standards.

Generally accepted professional standards require that the treatment planning process incorporate a logical sequence of interdisciplinary care:  (1) the formulation of an accurate diagnosis based on adequate assessments conducted by all relevant clinical disciplines; (2) identification of the problems caused by patients' illnesses; (3) establishment of goals designed to ameliorate problems and promote functional independence; (4) identification of appropriate interventions to guide staff as they work toward those goals; and (5) ongoing assessments and, as warranted, revision of the treatment plan.  To be effective, the treatment plan should be comprehensive and include input from various disciplines, as well as the individual patient, where appropriate, under the active direction and guidance of the treating psychiatrist.

KCHC treatment planning substantially departs from these standards and fails to meet the fundamental requirements for the treatment and rehabilitation of its patients.  As a result, patients' actual illnesses are not properly assessed and diagnosed; patients are not receiving appropriate treatment and rehabilitation; patients are at risk of harm from themselves and others; patients are subject to excessive use of restrictive treatment interventions; patients are at increased risk of relapses and repeat hospitalizations; and patients' options for discharge are significantly limited, resulting in unnecessary hospitalization.

1.   <u>Inadequacy of Psychiatric Assessments and Diagnoses</u>

a.   <u>Inadequate Psychiatrist Assessments</u>

Mental health treatment begins at the time of admission. The admissions process is designed to establish the initial diagnosis and sets forth the course of treatment.  Thus, an accurate assessment is crucial to proper treatment.  Clinicians must perform thorough assessments to identify patients' problems, strengths and needs.  Proper assessment also is vital to identify potential risks from patients who are aggressive or may engage in self-injurious behavior, who are potential victims, or who present high risks due to substance abuse or certain medical conditions.  Adequate assessments are essential to the development of a person-centered plan that can direct rehabilitation, treatment, and care while the patient resides in the hospital, and to formulate an adequate discharge and transition plan for the patient's return to the community. Generally accepted professional standards require that psychiatry, medicine, nursing, psychology and social work all provide an assessment.

At a minimum, an initial assessment should include:  (1) an adequate review of the patient's symptoms and mental status; (2) a provisional diagnosis and differential diagnosis that permits diagnosis and treatment options to be clarified over time; and (3) a plan of care that includes specific medication and/or other interventions to ensure the safety of the patient and others.

As more information becomes available, the assessment must be updated to include:  (1) a history of the patient's presenting symptoms; (2) the progression of the symptoms and setting within which the symptoms occur; (3) the relevant historical findings regarding the patient's biopsychosocial (biological, psychological and social) functioning; (4) a review and critical examination of diagnostic conclusions made in the past in light of new information; (5) a review of medical and neurological problems, if any, and their impact on the current status of symptoms and treatment; and (6) a complete mental status examination.

Numerous deficiencies exist in the initial assessments we reviewed at KCHC.  In many cases, initial assessments are cursory and untimely.  Patient histories and medical status are often incomplete and inadequate.  In addition, they are devoid of common psychiatric symptoms such as insomnia or loss of appetite

and fail to document mania, depression, or anxiety. They fail to identify the strengths of the patient. They also frequently fail to assess substance abuse history, vocational and educational history, and history of community living and prior placements. The absence of this important information in the medical record seriously impedes or limits the treatment team's ability to create an effective and appropriate treatment plan, which can lead to serious harm.

As a result of these flawed assessments, diagnoses are routinely tentative, unspecified, or inconsistent with the patient's symptoms. We found many diagnoses listed as "rule out" or "not otherwise specified" ("NOS"). These diagnoses are used by KCHC merely as catch-all categories. They are not appropriate long-term substitutes for genuine individualized assessments. However, in many cases, rule out and NOS diagnoses persist with no further diagnostic refinement. We also saw evidence of misdiagnoses which have not been adjusted to conform to patient behavior and symptoms. The medical record of patient J.P. is illustrative:

• J.P., who has had multiple re-admissions to KCHC, exemplifies the inadequacy of KCHC's assessments. He was originally brought to the CPEP by police on December 21, 2007, when he received a diagnosis of Psychosis NOS, and after denying "suicidal and homicidal ideas...hallucinations and delusions," was released. He returned to KCHC on January 26, 2008, after talking about jumping out a window. After again denying suicidal or homicidal ideation, J.P. was released. He returned to KCHC on June 13, 2008 and was given a diagnosis of mood disorder NOS. There is no accompanying psychiatric note or evaluation of his prior admissions. Several days later, pursuant to KCHC's treatment plan for him, he began receiving medication that he failed to take and had failed to take previously. He was released again on July 3, 2008 after denying suicidal or homicidal ideation. Ten days later, on July 13, 2008, J.P. was readmitted. Even though he was diagnosed as manic, with a mood disorder, he was diagnosed upon this admission with psychosis NOS and rule out bipolar disorder. The absence of a definitive diagnosis has perpetuated a generic treatment approach that has repeatedly failed this patient. J.P.'s record reflects the absence of meaningful assessment, reassessment, or targeted treatment. The patient was repeatedly discharged and readmitted with no reflection on the reasons for his recidivism and no change in treatment.

-17-

b.   <u>Inadequate Nursing Assessments</u>

We found that nursing assessments also were deficient. Nurses are a primary source of information regarding patients who need medical attention, as they are often the first clinician to see and evaluate the patient.  We found that initial nursing assessments at KCHC are cursory, and the assessment process and the nursing assessment form used by KCHC do not permit for comprehensive or individualized assessments.  The assessment form does not have sufficient space to allow nurses to write individualized findings, and there is no summary section for risk factors that would prompt nurses to think about the patient's needs in a comprehensive way.

Some examples of inadequate nursing assessments, which in turn often leads to inadequate treatment, include:

•   The nursing assessments we reviewed for patient H.C. lacked critical information.  Upon her admission to the inpatient unit, there were no notes in her assessment indicating social or medical problems.  However, other documentation contained in H.C.'s chart raised clear concerns about her social history and medical problems.  She was noted to be assaultive, abusive, electively mute, upset about her roommate, and had been sexually abused by her brother in the past.  In addition, she has asthma, Hepatitis C, and seizure disorder.  None of these are noted in the nursing assessments.

•   Thirty-seven-year-old W.H. was admitted with a history of mental illness and substance abuse.  The CPEP nursing assessments of W.H. were largely illegible.  Where they were legible, the assessments were not adequate in that they provided insufficient detail.  For example, her speech was described merely as "incoherent" with no further details. Her thought content was described as "unable to assess" although W.H. was apparently communicating on some level. The rest of the nursing assessment stated "unable to assess," though the record indicates that the social worker elicited information the nurse failed to capture.

•   Patient X.I. was admitted in July 2008 for disorganized behavior and delusions.  Most of the nursing assessment was left blank, even in sections where staff could have assessed X.I. without his cooperation.

KCHC's failures in the preliminary stages of assessment and diagnosis, as well as its failure to reassess patients to refine diagnoses, grossly depart from generally accepted professional standards. Patients receive, or are at risk of receiving, treatment that, at best, is unnecessary and, at worst, may actually exacerbate their mental illnesses. The result is that the actual mental illness is often unaddressed, placing patients at risk of prolonged institutionalization and/or repeated admissions to the facility.

2.   <u>Inadequate Treatment Plans</u>

Generally accepted professional standards require that treatment plans be individualized and specifically connected to patient problems and needs. The KCHC population presents severe psychopathology and behavioral disturbances that require individualized and intensive treatment programs that are customized to address the cognitive disabilities that are a key part of their illnesses. However, just as KCHC does not conduct assessments that address patients' specific problems or needs, it also uses boilerplate forms and checklists which require staff only to check off problems and treatment recommendations or briefly fill in blanks, rather than write individualized narratives.[20]

As a result, treatment plans do not specifically address problems that have led patients to be hospitalized. Many of the charts our experts reviewed reflected that patients with very different problems, which by generally accepted professional standards would require individualized treatment plans, instead receive exactly the same treatment plans. Moreover, patients with specialized needs do not have treatment plans specifically tailored to their needs and are not being adequately treated, including those with severe behavioral problems, those with suicidal ideation and self-injurious behaviors, and those who are dually diagnosed with mental illness and substance abuse or developmental disabilities.

Moreover, just as KCHC's assessments do not properly generate appropriate treatment plans, treatment plans do not link

---

[20]   Various treatment planning failures by KCHC were in cited in OMH's September 2004, June 2005, January 2006, September 2007, and August 2008 reports, such as lack of treatment goals in treatment plans, pre-dated treatment plans, failure to identify activity and therapy groups in treatment plans, missing treatment plan reviews, and a lack of interdisciplinary involvement in treatment planning.

-19-

to discharge needs.[21]  Discharge plans, in turn, focus almost entirely on placement options and neglect what the patient needs in order to get placed and to reduce the risk of re-hospitalization.

Failure to provide appropriate and effective treatment targeted to specific patient needs is harmful in a number of ways.  It permits dangerous behaviors to persist, it fails to address behavioral and psychiatric problems that led to hospitalization, it lengthens stays unnecessarily, it leads to the use of chemical and mechanical restraints, and it increases the likelihood of relapse and re-hospitalization.

Nursing involvement is particularly important in the treatment planning process.  Yet, nurses at KCHC do not appear to hold a central or consistent role in treatment planning.  Nurses are largely relegated to medication management and assuring implementation of close observations, which are often deficient, as described in Section III.C.1 _infra_.  There is also a lack of professional nurse interventions in any consistent manner, or in a manner that reflects nursing leadership in the care and treatment of patients.

Examples of inappropriate treatment include:

- R.E. is a 46-year-old male with schizoaffective disorder.  Over the course of a one month stay, he had ten episodes that led to placement in four-point restraints and the use of STAT medications.[22]  Notably, there was no change in his treatment plan to address his behavior, and the plan was limited to a boilerplate reference to a number of individual contacts with nursing staff and a small number of unit-wide treatment groups.

- V.O. is a 37-year-old male diagnosed with bipolar disorder with mania.  The medical record contains the standard treatment plan:  mandating of twenty minutes of individual and group therapy three times per week.  His treatment plan reflects no changes over time, despite nursing and doctor's

---

[21]    An adequate treatment plan will address goals and plans for a patient after he or she is discharged from the hospital, both to aid the patient in making a successful transition to the community, and to prevent or minimize future hospitalizations.  KCHC's treatment plans fail to adequately cover these elements.

[22]    STAT is a medical term meaning "immediate."  A STAT medication is one that is to be given immediately in response to an emergency or other urgency.

-20-

notes that consistently indicate that V.O. remains agitated, disorganized, and threatening to staff and others.

- Z.U. is a 49-year-old male with schizophrenia, multiple hospitalizations and a history of substance abuse. His treatment plan states that "pt. will participate in groups 3xs per week for at least 45 min to improve reality orientation." Our medical record review covered three separate admissions. His diagnosis changed across the admissions, but there was no substantive change in his treatment plan upon each admission to address his specific mental illness.

- R.Q. is a 20-year-old male diagnosed with schizoaffective disorder and mental retardation. He has had multiple admissions and a previous diagnosis of autism. R.Q. has a history of violence and his medical record documents multiple episodes in which he was assaulted by other patients or he assaulted others. There is no specific treatment plan to deal with his acting out or being victimized, except that he was transferred between units on multiple occasions. The treatment plan does not address his diagnoses of mental retardation and autism or his history of violence.

- L.R. is a 33-year-old male diagnosed as psychotic and delusional. Nursing notes consistently report he spends excessive time in the bathroom and he was seen repeatedly inducing vomiting, but his treatment plan fails to address these behaviors. The record also notes multiple falls, but there was no treatment response. A medical consult, conducted after L.R. was on the unit for almost three weeks, documented polydipsia[23] (excessive drinking of water). However, there were no nursing notes in his treatment plan regarding his water consumption. He was transferred to the medical unit and then to an inpatient psychiatric unit, where notes indicate he was incontinent of urine and feces. There is no specific treatment plan for these behavior problems, either.

We also reviewed the records of ten other patients who were dually diagnosed with mental illness and substance abuse. These patients were not provided any specific substance abuse

---

[23]   Polydipsia is a common disorder characterized by drinking excessive amounts of water to quench a constant thirst. This condition is prevalent in patients who spend significant amounts of time in psychiatric facilities, particularly those patients diagnosed with schizophrenia. This condition may cause incontinence, vomiting, seizures, water intoxication, or even death.

treatment. They were provided only once a week, unit-wide substance abuse groups. This treatment is not sufficiently frequent or individualized to address the needs of individuals with substance abuse problems.

### 3.   Lack of Systematic, Ongoing Assessment

Generally accepted professional standards require that all patients be assessed not just at admission, but on an ongoing basis. It is extremely difficult to diagnose patients fully at time of admission when they are acutely ill, uncooperative, and may be under the influence of alcohol or street drugs. Accordingly, diagnoses and problem lists should change as patients stabilize and become more comfortable admitting problems and symptoms.

Appropriate updating and revisions of diagnoses is uncommon at KCHC. KCHC has no systematic review or evaluation process for preparing diagnoses, and boilerplate forms make it too easy for staff to copy the language of previous diagnoses. Indeed, intake diagnoses and problem lists are often unmodified throughout patient stays, even as new information about patients becomes available over time. This contributes, as noted in the next section of this letter, to unmodified treatment plans, even as patients' conditions change.

### 4.   Failure to Modify Treatment Plans

A direct result of KCHC's failure to conduct ongoing assessments is that it does not modify treatment plans to address changes in patient behavior or condition. Generally accepted professional standards require regular review of treatment plans with adjustments contingent on progress or the lack of progress. KCHC medical records contain updated treatment planning forms, but the updates generally do not reflect substantive clinical reviews with modifications based on patient response. We found a number of charts in which patients exhibited significant, persistent behavior problems over time, but no changes were made in the treatment plan. In many cases, regardless of their efficacy, treatment plans for various patients used exactly the same language repeatedly, despite clear notations in the progress notes that there was no change in inappropriate behavior. Overall, the records do not suggest a sense of urgency to provide active treatment to deal with recurrent problems, and there is no evidence that treatment teams explore options or seek consultations with colleagues or outside experts.

-22-

Examples of non-responsive treatment planning include:

- N.S. is a 14-year-old male. The medical record notes more than 20 episodes of four-point restraint and administration of IM (intramuscular) medication for threatening behavior and verbal abuse during his more than seven-month stay at KCHC. On August 15, 2008, his attending psychiatrist reported that "[N.S.'s] continued stay in the acute setting is detrimental to his well-being. He will likely continue to have acting out behavior. It is recommended that he be in a program that is able to meet his special needs." Nonetheless, his treatment plan was identical for the entire seven-month stay.

- T.F. is a 46-year-old female with paranoid schizophrenia. She is unable to care for herself and needs an interpreter as she speaks no English. The treatment plan we reviewed was minimal and not suited to her illness or her inability to speak English. While the treatment plan updates note a lack of progress, there is no substantive change in the treatment plan that could lead to such progress or improvement.

- M.M. is a 16-year-old male with a diagnosis of schizophrenia or bipolar disorder. He was on the child and adolescent unit for six months with repeated reports of aggressive acting out and disruptive behavior. He was placed in restraints multiple times for assaultive behavior, but there was virtually no change in his treatment plan.

5. Ineffectiveness of Treatment Team Process

A significant reason for the deficiencies cited above is that KCHC's treatment team process does not comport with generally accepted practices. Generally accepted professional standards call for treatment to be guided by a multi-disciplinary team in which diverse professional expertise and observations are employed, in an inter-disciplinary process, to evaluate patients and develop treatment plans.

Also, contrary to generally accepted professional standards, it appears that, at KCHC, treatment planning by the different disciplines is done in isolation rather than in an integrative manner. Staff members spend most of their time in treatment team meetings describing events that occurred the previous day or entering notes into patient's charts. There is little discussion of treatment or substantive discussion of patients' conditions. Patients do not regularly participate. There is little inter-disciplinary interchange.

-23-

The fact that team meetings are not used to share expertise and ideas significantly limits the ability of staff to develop suitable treatment plans and contributes to the failure of many plans. It also diminishes the ability of staff to effectively revise plans that are not working.

We also find that nurses' involvement in treatment activities was not adequate. We found that treatment on the adult inpatient units appears to be largely generic and custodial. Additionally, the nursing activity schedule for the units does not reflect treatment groups run by other disciplines. Patients' records also fail to consistently reflect participation in such groups. Further, there was no documentation summarizing an individual patient's treatment activities reflected in either the treatment plan or the discharge plan summary.

Finally, KCHC does not appear to track or review individual patients who are not making progress or who repeatedly exhibit the same problematic behaviors. This lack of oversight permits ineffective treatment to continue without detection or correction. This presents a clear danger to patients and staff because it permits faulty practices to be repeated, with no corrective action taken. We were told that new policies, systems, and procedures were being put in place by some of the new administrative and supervisory staff, but there is no evidence as to when and how these changes will be implemented.

6.     Inadequate Medication Management and Monitoring

Medication practices at KCHC substantially depart from the generally accepted professional standards. Generally accepted professional standards require that the pharmacological component of a treatment plan reflect the exercise of professional judgment for medication treatment including: diagnosis, target symptoms, risks and benefits of particular medications, and consideration of alternate treatments. The rationale for each patient's course of treatment should be included in the physician's progress notes. Psychotropic medications should be used as an integral part of a treatment program to manage specific behaviors in the least restrictive manner, to eliminate targeted behaviors/symptoms, and to treat specific psychiatric disorders. Additionally, medications should be integrated with any behavioral intervention plan. Medications should be carefully monitored and tracked. Medication changes, as well as the rationale for the changes, should be documented in a physician's order. All lengthy administrations of medication should be

-24-

periodically re-evaluated to assess their efficacy.  KCHC's
practices fall far short of all of these requirements.[24]

KCHC's practices have led to the inappropriate use of
medication.  As noted above, assessments are deficient.  As a
result, the rationale justifying why certain medications are
prescribed is not stated in patients' charts or is stated very
generally (e.g., "psychosis").  In addition, medications at KCHC
are frequently prescribed in reaction to events without an
assessment or modification of the treatment plan.  KCHC therefore
frequently administers PRN (pro re nata or "as needed")
medication that is not targeted to specific symptoms of mental
illness, and lacks adequate justification.  For example, T.Z. is
a 16-year-old adolescent with an IQ of 40.  He has been both a
victim and perpetrator of violence prior to and during his
hospital stay.  Most recently, he was admitted due to assaultive
behavior.  T.Z. continues to receive a variety of PRN medications
that are not targeted to alleviate or address any specific
symptoms.

In addition, KCHC contemporaneously uses multiple
medications in the same class to treat the same condition
(usually referred to as intraclass polypharmacy) without a
clinical justification.  This falls outside of generally accepted
professional standards.  The problem is recognized by KCHC in a
memorandum to "All Prescribers" dated March 28, 2008 on the
subject "Applied Psychopharmacology."  The memorandum prohibits
the then-common practice of simultaneous intramuscular injection
of two antipsychotics.  Nonetheless, KCHC physicians continue to
routinely use drug combinations of anticholinergics,
antipsychotics, and benzodiazapines that are not clinically
justified.  This can cause substantial patient harm, including
overdose and serious side effects.

Moreover, rather than prescribing antipsychotic medications
and benzodiazepines for their specific purpose -- medications to
alleviate or minimize symptoms of psychosis and anxiety -- it
appears that clinicians inappropriately prescribe these
medications to sedate and control patients, and as a substitute
for appropriate therapeutic interventions.  This too is

───────────────

[24]   Notably, CMS's August 2008 letter cites KCHC's failure to
provide appropriate evaluation of care -- including medication
monitoring -- for each patient.  As an example, it notes that a
nurse responsible for entering progress notes on six patients
acknowledged to CMS surveyors that she did not know the diagnosis or
medications of any of those patients.

inappropriate, and can cause patient harm, by subjecting patients to unnecessary medication.

Additionally, generally accepted professional standards require that facilities like KCHC adopt and incorporate the necessary protections and safeguards to ensure that patients are afforded safe and effective pharmacological treatment.  Hospitals such as KCHC must have mechanisms to:  (1) monitor practitioners' adherence to specific and current guidelines in the use of each medication; (2) report and analyze adverse drug reactions; and (3) report, analyze, and document actual and potential variations in the prescription, transcription, procurement/storage, dispensing and administration of medications.  To the extent that these mechanisms exist at KCHC, they are inadequate.  Because KCHC's psychiatrists rarely analyze the use of PRN and STAT medications or patients' reactions to them, they cannot refine patients' diagnoses and adjust routinely administered medications.  Without such monitoring, patients are at risk of being overly and/or improperly medicated.  This practice constitutes chemical restraint, which violates federal regulations.  See 42 C.F.R. § 482.13.  This practice also substantially departs from generally accepted professional standards.

KCHC's current system to track and analyze adverse drug reactions also is deficient and seriously under-reports problems. No data is compiled regarding basic components, such as a definition of an adverse drug reaction, a severity scale, a probability scale, or a description of patient outcome.  There are no established thresholds triggering analysis of adverse drug reactions.  There is no data analysis to indicate individual or group practitioner trends.  And, there is no evidence that any data on adverse drug reactions have been used for performance improvement activities.  For example, drug utilization evaluations ("DUEs") are not used to track and analyze adverse drug reactions.

C.   Inadequate Behavioral Management Services

Behavioral management is the use of systematic behavioral (social learning) strategies.  These are often the best, and only, non-intrusive approaches to eliminate dangerous behaviors and teach patients more adaptive ways to behave.  Accordingly, behavioral plans should, in accordance with generally accepted professional standards, contain certain basic elements, including an analysis of the reasons for the behavior and its frequency, and its causes.  The plan should also identify specific interventions by trained staff in order to address and modify the

behavior. The behavior plan should thereafter be integrated with the patient's overall plan of care.

KCHC fails to provide adequate behavioral management. Behavioral management plans are not well integrated into overall treatment, and staff lacks the skills and training necessary to handle the large number of very impaired patients who are dangerous to themselves or others or who have specialized needs. Contrary to generally accepted professional standards, staff at KCHC is focused primarily on controlling patients with inappropriate behavior rather than treating them and teaching them alternative, adaptive behavior. Accordingly, in lieu of appropriate treatment, staff resort to close observation (which is often lax as demonstrated by serious incidents described in Section III.A.2 supra), restraint, and inappropriate medication practices. Indeed, KCHC fails to use systemic behavioral (social learning) strategies to eliminate dangerous behaviors and teach patients more adaptive ways to behave. This problem is exacerbated by KCHC's failure to provide a centralized system of oversight, review, feedback, and expert consultation, where necessary, to protect patients and ensure that adequate treatment is provided. The result is that patients with the most severe needs receive inadequate therapeutic care and treatment.

### 1. Inappropriate Use of Close Observation

Generally accepted professional standards require that close observation of mental health patients be used only when necessary. It is sometimes appropriate for patients who are at high risk of engaging in self-harm or harm to others. However, it is costly to use and removes staff from other therapeutic activities, is stigmatizing for patients, it restricts privacy and freedom, and it is often disruptive to clinical units. Moreover, it is a management procedure, not a treatment procedure, and does not teach patients more adaptive ways to behave.

KCHC does not use close observation consistent with these principles. Rather, it purportedly uses close observation excessively and performs it incorrectly. At KCHC, close observation is initiated for almost all new patients who have suicidal ideation or are potentially violent. A large proportion of patients are maintained at this level of observation throughout their stay at KCHC whether or not warranted by their behavior. Indeed, it appears to be standard operating procedure at KCHC to use one-to-one in lieu of proper treatment; however, its use has been ineffective. For example (as described above):

-27-

• The three adolescent youths who were involved in sexual activity on September 25, 2008 and September 26, 2008 were all on close observation by a different staff member prior to the incident. Each observation of the patients was indicated in the patients' charts with the initials of the staff members responsible for the observation, presumably signifying that the required observation had occurred. However, neither incident was detected at the time it occurred. In fact, the incidents became known to staff only when another boy reported it two days later. Based on the incidents that transpired, it is implausible that KCHC staff was appropriately performing the required observations.

2. Inappropriate Use of Four-Point Restraints and Emergency (STAT) Medications To Manage Patient Behavior

The right to be free from undue bodily restraint is the core of the liberty protected from arbitrary governmental action by the Due Process Clause. Youngberg, 457 U.S. at 316. Thus, KCHC may not restrain mental health patients "except when and to the extent professional judgment deems this necessary to assure [reasonable] safety [for all residents and personnel within the institution] or to provide needed training." Id. at 324.

Generally accepted professional standards require that restraints: (1) will be used only when persons pose an immediate safety threat to themselves or others and after a hierarchy of less restrictive measures have been attempted; (2) will not be used in the absence of, or as an alternative to, active treatment, as punishment, or for the convenience of staff; (3) will not be used as a behavioral intervention; and (4) will be terminated as soon as the person is no longer a danger to himself or others. KCHC's use of restraints substantially departs from these standards and exposes patients to excessive and unnecessarily restrictive interventions.

New York Mental Hygiene Law § 33.04 and generally accepted professional standards require that restraints be used only when less restrictive procedures have not been effective. We found that KCHC does not consistently follow these standards. KCHC excessively relies upon four-point restraints and STAT medications to deal with patients who aggressively act out, regardless of whether the patients pose a continuous threat. Our experts also found little evidence that less restrictive means were employed before restraints were applied, such as proactive assessment to identify risky situations, moving patients to quiet areas, or calming conversations with trained staff. It also appears that restraints are often used even though the patient

has changed his or her behavior and does not pose any further risk.

KCHC policy also requires that restraints may not be applied for more than two hours and that patients should be released sooner if they are no longer agitated or dangerous.  Most examples we reviewed indicate that patients remained in restraints for two full hours regardless of changes in their behavior.  There is also no indication in the progress notes or restraint orders that patients are clearly told why they are being put in restraints and what the criteria are for release. Absent clear communication to the patient and absent evidence of continued risk, four-point restraint serves as a punishment for acting out rather than as a therapeutic vehicle or a safety strategy.[25]

### 3.   Inappropriate Transfers of Patients In Lieu of Treatment

Instead of providing appropriate behavioral interventions, KCHC resorts to inappropriate transfers of patients between units as a response to inappropriate behaviors.  Moving patients is stigmatizing, clinically disruptive, and generally does not improve patient behavior.  Although moving a patient can be clinically appropriate at times, the medical records we reviewed do not indicate that transfers at KCHC are implemented with any clinical rationale.  Rather, transfers appear to be used largely to remove a patient who engages in aggressive behavior or who is a victim of patient aggression.  Moreover, patients are being transferred in lieu of providing appropriate treatment.  The following examples are illustrative:

• V.G. is an 18-year-old woman with a diagnosis of bipolar disorder with mania who has been admitted to KCHC four times in six months.  She was repeatedly agitated, intrusive, hostile, and sexually preoccupied.  While there is no specific treatment plan for these problems or her sexual preoccupation, V.G. has repeatedly transferred from unit to unit due to these problems.

• M.T. is a 52-year-old male with a diagnosis of schizoaffective disorder.  In six weeks at KCHC, he resided

---

[25]     OMH cited KCHC for its overuse of restraints in its November 2008 and April 2006 surveys.  Specifically, OMH found that restraints are not used "only when absolutely necessary to protect the patient or others from injury."

in three different units. He was admitted to one unit, but transferred to a second unit after an altercation with staff. He was then transferred to a third unit for assaultive behavior on the second unit. While on the third unit, he attacked a peer. M.T.'s treatment plan fails to address his aggressive behavior.

D.    Failure to Provide Adequate Medical and Nursing Care

1.    Inadequate Assessments and Monitoring

As with psychiatric treatment, effective medical services depend on timely, thorough assessments and monitoring. KCHC staff often fail to provide even the most basic care, opting instead for a reactive approach in which they address patients' medical needs only after problems develop. This exposes patients to a significant risk of harm and causes patients often to suffer preventable injuries and illnesses.

For example, we found that patient weights, although taken on admission, do not seem to be monitored consistently. Nor do nurses appear to note Body Mass Index values with any consistency, despite a KCHC policy requiring the capture and recording of this data. Monitoring weight gain in psychiatric patients is particularly important because many medications can produce rapid weight gain, which in turn can lead to medical problems, including diabetes and hypertension, that are exacerbated by excess weight.

We highlighted one example of KCHC's failure to provide adequate basic medical care in our August 22, 2008 immediacy letter (attached). In that letter, we described a patient on Unit G-53 who had uncontrolled diabetes. Her blood sugar readings ranged from 40 to 400 over the course of one 24-hour period.[26] Her chart indicated that nothing was done to stabilize her condition. This put the patient at immediate risk of harm, including diabetic shock or stroke.

Additional examples include:

*   Patient R.R. was admitted on October 2, 2007 with a psychiatric diagnosis of bipolar, mixed with psychotic

---

[26]    The normal/safe range for blood sugar is 100 or less. The failure to control sugar levels can result in blindness, stroke and other serious or even life-threatening conditions.

features, and a history of substance abuse. R.R. also had
other serious medical issues, including obesity (he weighs
425 lbs.), hypertension, lipidemia (the presence of excess
fat in the blood), and diabetes. R.R.'s treatment plan did
not address any of his medical issues. Eight days after his
admission, he was taken to the medical emergency room after
he suffered a stroke. Only after he returned to the
behavior health service was his medical record corrected to
note his history of hypertension and diabetes.

- O.L. is a 41-year-old man who has been admitted to KCHC 55
  previous times since 1983 and has multiple medical records.
  Although he has a history of hypertension and heart
  arrhythmia, the medical section of his treatment plan was
  blank. Accordingly, he failed to receive an adequate
  medical assessment.

- Q.M. walked into to the CPEP and reported that he was
  hearing voices telling him to hurt someone, and that the
  previous week voices told him to jump in front of a subway.
  The assessment performed by KCHC personnel did not find any
  risk for self harm.

2.  Failure to Provide Adequate Emergency Responses

     Another essential component of adequate medical care is the
ability to provide sufficient care in emergency situations.
Generally accepted professional standards require that all staff
should be well-trained in emergency preparedness, know what
emergency materials are available and where they are located, and
conduct sufficient practice emergency drills (called "Mock Code
Drills" at KCHC) to be able to perform adequately when confronted
with an actual emergency. Appropriate emergency medical response
also includes physical plant readiness, e.g., having the proper
equipment available at all times.

     KCHC practices and procedures regarding emergency
preparedness deviate substantially from generally accepted
professional standards.[27] This deficiency was brought very
clearly into focus by the death of patient Esmin Green in the
CPEP on June 19, 2008 (described above). Our review of records
and materials, including surveillance video, in connection with
the death of Ms. Green indicated that, contrary to generally

---

[27]    The August 2008 CMS survey of KCHC documented numerous
deficiencies with KCHC's emergency response to medical codes,
specifically in the case of Ms. Green's death.

accepted professional standards, no one was clearly in charge of
coordinating or directing the code for several potentially
crucial minutes.  From the video, it also appears -- contrary to
generally accepted medical practice -- that medical staff failed
to immediately address airway, breathing or cardiac issues
("ABCs"), but rather, first took a "finger stick" to assess
Ms. Green's blood sugar.[28]

KCHC's lack of emergency preparedness goes beyond this
single event, however.  For example, we found a significant lack
of Mock Code Drills at KCHC.  There were no Mock Code Drills run
in 2007, and none occurred during the first quarter of 2008.  Two
Mock Code Drills were run in the third quarter of 2008.  However,
both clearly reflected a failure to meet professional standards
of practice.  The following deficiencies were noted:  (1) delays
in initiating CPR; (2) staff had to be reminded to use the
Automatic Emergency Defibrillator ("AED") and delayed using it;
(3) staff did not call for assistance, and a physician failed to
adequately respond when called; (4) ABC's were not followed; and
(5) staff responder forgot to bring the crash cart.  Notably,
many of these same deficiencies were present in the Esmin Green
incident.

Given the multiple deficiencies noted on the two Mock Code
Drills run since Ms. Green's death, KCHC's medical emergency
preparedness is clearly inadequate.

3.    Failure to Provide and Maintain Adequate Medical
      Documentation

Generally accepted professional standards require that
clinical records be complete, accurately documented, readily
accessible, and systematically organized.  The records should be
sufficiently detailed to provide for continuity of care.  KCHC
fails to ensure that patients' medical records completely and
accurately reflect their care.  Our investigation revealed
numerous instances of inadequate or absent documentation by
medical and nursing staff, leading to harm or the risk of harm to
KCHC patients.[29]  For example:

[28]    In addition, as we pointed out in our August 22, 2008
immediacy letter, the video also shows a nurse, when she first
responds to Ms. Green, nudging her with her foot.

[29]    KCHC has been cited for inadequate or missing
documentation in other surveys.  In September 2006, the New York
State Commission on Quality of Care and Advocacy for Persons with

- H.C.'s chart indicated no medical problems even though this patient, who apparently has been admitted multiple times to KCHC, has asthma, Hepatitis C, and a seizure disorder.  Her nursing assessments were incomplete on earlier admissions.

- P.K. arrived in the CPEP in an acute psychosis, and exhibiting paranoia and poor hygiene.  He was noted to be HIV-positive, to have a seizure disorder, and a history of substance abuse.  The nursing assessment documentation was incomplete, and there were no social problems or treatment discharge issues noted, despite P.K.'s obvious history of psycho-social problems.

As noted above in the section on treatment planning, treatment plans were also inadequately documented by nursing staff.  We reviewed a number of records where the treatment goals were omitted even though the patient's particular problem had been identified.  This was especially true with those patients whose social problems increase the likelihood of repeat hospitalizations.

Further, nurses do not consistently record information in patients' charts properly.  Notes are not made directly below the last entry, nor do nurses commonly use hand drawn lines to cross out blank space within the record.  This kind of charting creates a situation where, as noted below, post-dating the record becomes possible.

4.   Falsification of Medical Records

Disturbingly, we have become aware of at least three instances of falsification of records.[30]  The need for accurate,

---

Disabilities, an independent New York State governmental agency charged with improving the lives of people with disabilities, noted irregularities between KCHC's report to OMH of the number of hours between patients' arrivals at the CPEP and their departure or admission to an inpatient unit for 2005 and 2006.  It requested an explanation of "how this misrepresentation was able to occur."  In addition, JCAHO found progress notes and medical records with illegible entries which it described as "precluding effective written communication between caregivers regarding the patient's condition and progress."

[30]   Falsification of documents related to the death of patient Esmin Green was also cited in CMS's August 2008 letter and DOH's July 2008 letter.

truthful record-keeping should be self-evident.  Without accurate
records, it is impossible for patients to receive appropriate
clinical intervention, and substantial harm can arise.  Moreover,
given the pattern of false records that we have observed, we
cannot be certain of the veracity or reliability of the records
that have been presented to us.  The following constitutes three
known instances of falsification:

- When Esmin Green died on the morning of June 17, 2008, after
  lying unattended on the floor of the waiting area in the
  CPEP between 5:30 and 6:30 a.m., nursing notes asserted
  that, during that hour, Ms. Green was repeatedly observed
  alert and awake.  Video surveillance tapes we reviewed
  demonstrated that this was patently false, and that no one
  attempted to assist her throughout the time she lay on the
  floor.[31]

- During our site visit in July 2008, we requested the records
  of patient H.C.  We were told that one of the nurses
  responsible for delivering the chart to us had altered the
  record at the direction of her supervisor, an Associate
  Director of Nursing.[32]

- The medical records for patient G.B., who was found on his
  knees in a bathroom in the CPEP apparently engaged in oral
  sex with another patient indicate that the Psychiatric
  Health Associate ("PHA") had, as per policy, conducted
  regular 15 minute checks on both patients.  However, KCHC
  has informed us that surveillance video of the CPEP shows
  that the PHA falsified the records, and did not, in fact,
  conduct the 15 minute checks.

E.   Inadequate Quality Assurance and Performance Improvement

Generally accepted professional standards require that a
facility like KCHC develop and maintain an integrated system to
monitor and ensure quality of care across all aspects of care and
treatment.  An effective quality management program must
incorporate adequate systems for data capture, retrieval, and
statistical analysis to identify and track trends.  The program

---

[31]   We notified counsel for HHC of this serious concern in our
August 22, 2008 immediacy letter.

[32]   The fact that this patient's medical record was altered
was brought to our attention by HHC officials at the end of our site
visit in July 2008.

-34-

also should include a process for developing a corrective action plan and a process for monitoring the effectiveness of corrective measures that are taken. Throughout this letter, we have enumerated various failures by KCHC to provide adequate care and treatment for its patients. With few exceptions, KCHC has failed to identify these problems independently, or formulate and implement remedies to address them. Consequently, actual and potential sources of harm to KCHC's patients continue unaddressed.

An adequate quality management program has two components: (1) quality assurance ("QA"), which focuses on evaluating compliance with basic standards of quality that are either internally or externally imposed; and (2) performance improvement ("PI"), which focuses on identifying missed opportunities to improve care, identifying preventive actions, and delineating remedial measures to improve the care and delivery of treatment and services provided to patients.

KCHC has failed to implement an appropriate quality assurance and performance improvement program. As a result, KCHC often does not identify or analyze deficiencies in the treatment and services provided to patients or in systems and procedures designed to protect patients from harm in a timely or adequate manner.

KCHC's quality assurance and performance improvement programs often are poorly organized and fail to establish priorities to identity the particular issues that need to be addressed. The hospital does not establish criteria for analyzing the variety of data that they routinely collect, and fails to analyze appropriately the data for trends and underlying causes.

Moreover, as indicated above, KCHC also lacks adequate procedures for investigating untoward events, serious injuries, and important or critical events. Our consultants found that staff conduct little or no follow-up to determine the cause of an incident, its effect on the patient, or how similar incidents might be avoided in the future. As a result, patients continue to be exposed to actual and potential harm.[33]

---

[33] Our interview with a consultant recently hired by KCHC to review the QA/PI process confirms our findings. The consultant found the current QA/PI process to be inadequate and recommended a review and revision of all QA/PI to conform to generally accepted professional standards: "real time" monitoring, with the

F.  Unsafe Physical Environment

     The Fourteenth Amendment Due Process Clause requires public
mental health care facilities to provide patients with "adequate
food, shelter, [and] clothing," along with conditions of
reasonable care and safety.  Youngberg, 457 U.S. at 324.

     1.  Inadequate Fire Safety Planning and Training

     In accordance with generally accepted professional
standards, KCHC must have an adequate fire safety plan and
provide adequate training to its staff to respond to fire
emergencies.  Hospital staff must be adequately trained to
respond to reports of fire or smoke, and be able to safely
evacuate the patients within their care.  We find that the
present fire safety planning and training is wholly inadequate
and exposes both patients and staff to an unnecessarily high risk
of harm, including death.

     Staff are critically deficient in their training and
response to fire.  We observed two unannounced mock fire drills
during which all involved staff made potentially life-threatening
errors.  For example, staff failed to inquire about the location
of the fire, failed to pull a fire alarm to alert others to
respond to the location, and, when other staff did respond, they
failed to bring portable fire extinguishers to the site.
Moreover, actions to evacuate patients were woefully
inadequate.[34]  The staff also were unaware of any policy or
procedure as to how to address patients who refused to leave the
building in an emergency.[35]  Moreover, KCHC's fire safety
documentation is poorly designed, inapplicable to the areas used
for behavioral health services, and lacking in appropriately

_____

requirement of contemporaneous documentation of activities; in-
service training of KCHC staff on QA/PI; a massive culture change
that needed to be built into all levels by all disciplines; and
strong leadership and commitment.

[34]     During the course of the drills, we observed a physician
leading patients down the hallway toward the fire location, and
patients wandering unchecked by staff down the hall toward the fire.
One unit supervisor did not know how to access the locked emergency
exit stairwell, although we were told that the supervisor should
have a key to the stairwell.

[35]     We notified counsel for KCHC of these serious concerns in
our June 18, 2008 immediacy letter.

-36-

critical assessments or feedback to improve the fire safety
program.

### 2. Inadequate Handling and Disposal of Hazardous Materials

KCHC's present system for handling and disposing of
hazardous materials, including medical waste materials, exposes
patients, staff, and the Kings County community to risk of harm.
Generally accepted professional standards require that discarded
materials saturated in blood or other potentially infectious
materials be placed in red biohazard bags, and securely stored to
prevent access.

During our tour, we found several red biohazard waste bags
as well as a clear plastic bag that appeared to contain bloody
linens outside in open waste carts.  These bags were not secured,
and were accessible to anyone who might walk by.  In fact, a
homeless person was observed sleeping approximately fifty feet
from the carts.  This is a violation of biohazard waste storage
and handling practices and places individuals who may come in
contact with these wastes at serious risk of injury or disease
transmission.[36]

### 3. Inadequate Environmental Infection Control

KCHC fails to take appropriate steps to prevent the spread
of infectious agents through laundering practices, storage of
patient clothing, linen replacement, and basic housekeeping
measures.  We learned during our site tour in May 2008 that
methicillin-resistant staphylococcus aureus ("MRSA") has been
identified at KCHC, although not at high levels.[37]  Environmental
considerations, such as laundry, are critical in preventing the
spread of this organism.

---

[36]   Id.

[37]   MRSA is a highly contagious bacteria commonly found in
institutional settings that is resistant to certain antibiotics,
including methicillin.  Centers for Disease Control and Prevention,
at http://www.cdc.gov/ncidod/dhqp/ar_mrsa_ca_public.html.  The
disease presents itself at first as a boil or sore on the skin, and
is easily spread through contact with an infected person or with a
surface the person has touched.  Id.  In some cases, MRSA can lead
to serious complications, including surgical wound infections,
bloodstream infections, and pneumonia.  Id.

The Centers for Disease Control ("CDC") recommend that laundry be washed in water at least 160 degrees Fahrenheit. The washing machines on units available for patients provide water at only 107 degrees. This creates a significant risk that patients' personal clothing may spread MRSA or other pathogens even after being laundered. Moreover, KCHC does not properly store patients' clothing. Patients' stored clothing is not routinely laundered or disinfected before being stored. In the CPEP, patients' clothing is stored on the floor. On the child and adolescent unit, patients' clothing is stored in mesh bags, closely packed together in a closet, where mouse excrement was later observed.

In addition, KCHC uses worn bedding which cannot be properly cleaned and disinfected between uses. For the purpose of infection control, bedding and similar items should be replaced regularly once they reach the end of their service lives.

### 4. Unsafe Food Handling and Preparation Practices

Pursuant to generally accepted professional standards, KCHC is obligated to provide adequate food to patients consistent with safe preparation and handling practices. Proper cooking, holding, and serving temperatures and time frames are critical to prevent the risk of food borne illness. We found deficiencies in food handling at KCHC that put patients at risk for transmission of food borne illnesses.

Food temperatures are not being routinely monitored at serving locations. The pantry in the second floor of the adult inpatient building lacked a thermometer and temperature logs. When questioned about this, food service staff members indicated that thermometers were missing from several pantries, and the food service director was unable to produce any temperature logs from serving locations for the month of May 2008. Patients who were served this food were placed at risk of food borne illness.

### 5. Failure to Address Suicide Hazards in Patient Areas

Due to the nature of the patient population, KCHC should proactively address suicide hazards and vigilantly observe patients to minimize the risk of suicide. We acknowledge that KCHC has taken some steps to reduce suicide hazards, but many of the problems still remain, especially in the CPEP.

The CPEP is a high risk area for suicides due to its building fixtures and overpopulation. For example, the male and female bathrooms both have sink handles and shower control knobs

that could easily be used by a patient to tie a shoelace or some other ligature around, place the other end in a noose around his or her neck, and sit down, asphyxiating him or herself. In addition, these areas are not constantly visible to staff nor regularly monitored by staff.[38]

G.    Inadequate Clinical Leadership

The major role of clinical leadership in any institution is to ensure that professional standards of practice and accountability are maintained. Specifically, clinical leadership should respond, in a timely manner, to identified problems and offer stable, consistent administrative guidance and supervision. KCHC fails to provide such adequate clinical leadership. Leadership in all of the major disciplines at KCHC appears to be overwhelmed and reacts primarily to escalating crises. Repeated failure by leadership to implement timely appropriate corrective action plans have led to significant harmful situations.

Agencies such as CMS, OMH and other outside consultants have cited deficiencies at KCHC, including inadequate programming, the excessive use of seclusion and restraint, and unsafe clinical situations that have resulted in injuries to patients, including death. Despite these clear findings of repeated deficiencies, these conditions remain unabated. Despite repeated "plans of correction" and leadership's verbalization of an understanding of the extant deficits, the system of care remains in disarray with no sense of urgency of the need for things to change. Patient and staff injuries continue to occur with an alarming regularity without adequate leadership intervention. The critical incidents that occurred in the CPEP and on the child and adolescent unit reflect the egregious consequences of the failure of the existing leadership to address effectively burgeoning problems.

---

[38]    KCHC has been notified on many prior occasions about the presence of suicide hazards. The September 2004, January 2006, May 2006, May 2007, and November 2008 OMH surveys described various suicide hazards in patient areas. Similarly, JCAHO's July 2008 survey also noted the presence of suicide hazards. We do note that KCHC plans to move all of its mental health patients to a new building commencing sometime in early 2009, which may ameliorate some of these physical plant defects.

H.   Inadequate Discharge Planning And Placement In The Most
     Integrated Setting

     Within the limitations of court-imposed confinement, federal
law requires that KCHC actively pursue the timely discharge of
patients to the most integrated, appropriate setting that is
consistent with the patients' needs.  Olmstead, 527 U.S. at 607.
Thus, at the time of admission and throughout a patient's stay,
KCHC should:  (1) identify, through professional assessments, the
factors that likely will foster viable discharge for the patient,
and (2) use these factors to drive treatment planning and
intervention.  Treatment planning must be directed toward
returning the patient to the community as quickly as possible.
Consequently, generally accepted professional standards call for
assessment of the recovery environment, identification of
problems related to adaptation in the community and efforts to
enhance the prospects for recovery.  This must begin at admission
and include important members of the individual's natural and
professional support system.  Readmission within a brief time
should be treated as a failure of the discharge planning process
and should be tracked as part of the hospital's outcome measures.
Without clear and purposeful identification of such factors and
related issues, patients will be denied rehabilitation and other
services and supports that will help them acquire, develop,
and/or enhance the skills necessary to function in a community
setting.

     The discharge planning process at KCHC falls significantly
short of these generally accepted professional standards of care.
Treatment teams typically do not consider or integrate criteria
for discharge into treatment planning.  Consequently, many
patients whose psychiatric conditions are largely under control
remain hospitalized because of poor daily living skills,
aggressive conduct, incontinence, inadequate dietary management,
failure to take medication, and/or other behaviors that prevent
discharge and community reintegration.  Although such behaviors
often can be resolved with proper treatment, KCHC rarely
addresses these issues in patients' treatment plans or in the
facility's discharge planning.  This leads to frequent re-
admissions, which in turn suggests a failure of discharge
planning.  Examples include:

•    S.D., who has been admitted to KCHC 12 times in nine years
     and has made another seven visits to the CPEP during that
     time period.

•    J.P., who had been repeatedly admitted and discharged during
     the past year without any meaningful assessment,
     reassessment, or targeted treatment.

- W.H., who has had five admissions in less than three months. Her record reflects KCHC's failure to:  adequately assess prior admissions; reach a clear differential psychiatric diagnosis; adequately assess the clinical efficacy of past medication interventions; adequately address her repeated aggressive behavior and its relation to mania or mixed states and resulting poor judgment; and conduct appropriate mental status exams.  Accordingly, W.H. has been subjected to a range of shifting combinations of anti-psychotics and discharges to settings that are inappropriate for her needs.

The failure to provide adequate, individualized treatment and discharge planning for these and other patients deviates from generally accepted professional standards and contributes to extended hospitalizations, unsuccessful community placements, and a high likelihood of readmission.  Patients are harmed or exposed to the risk of harm by the effects of prolonged institutionalization and by being denied a reasonable opportunity to live successfully in the most integrated, appropriate setting.

## IV.  FINDINGS PURSUANT TO § 14141

In furtherance of our investigation pursuant to § 14141, we and our expert consultants in police and hospital security practices reviewed relevant documents, including policy memoranda and training materials.  As in the case of our CRIPA investigation, we toured KCHC with our expert consultants, and interviewed a cross-section of Hospital Police supervisors and officers as well as clinical staff, including hospital administrators, doctors, nurses, and other behavioral health staff.  We also interviewed representatives from HHC.

Our investigation has revealed a number of serious policy and procedure deficiencies in the KCHC Hospital Police Department.[39]  Most significantly, the Department lacks a comprehensive, coherent set of policies and procedures and those policies which do exist are not effectively communicated to officers.  As a result, there is confusion among Hospital Police officers and clinicians regarding the role of Hospital Police.  This can result in inappropriate conduct by officers. One clear example is the complete failure by two Hospital Police officers to assist patient Esmin Green as she lay on the floor of the CPEP on the morning of June 19, 2008.

---

[39]     We will be sending under separate cover a Technical Assistance letter regarding the KCHC Hospital Police Department.

-41-

In addition, we have determined that supervision and training of new officers is inadequate.  As will be detailed in our Technical Assistance letter, new officers are poorly trained, particularly with respect to engaging mental health patients, and supervision is lax.  Finally, KCHC lacks a coherent and effective system for receiving, reviewing and investigating incidents and complaints involving the Hospital Police.

**********************

## VI. RECOMMENDED REMEDIAL MEASURES

To remedy the deficiencies discussed above and to protect the constitutional and federal statutory rights of the patients at KCHC, KCHC should promptly implement the minimum remedial measures set forth below:

A.  Protection From Harm

KCHC should provide its patients with a safe and humane environment and protect them from harm.  At a minimum, KCHC should:

1.  Create or revise, as appropriate, and implement, in accordance with generally accepted professional standards, policies and procedures for the monitoring and supervision of patients, especially patients at risk, and ensure that all policies and procedures are integrated into routine assessment, re-assessment, and treatment planning.

2.  Create or revise, as appropriate, and implement policies and procedures that comport with generally accepted professional standards to address:

   a.  patient aggressive and assaultive behaviors;

   b.  patients expressing suicidal ideation and attempting self harm.

3.  Create or revise, as appropriate, and implement comprehensive, consistent incident management policies and procedures that provide clear guidance regarding reporting requirements and the categorization of incidents, including those involving any physical injury; patient aggression; abuse and neglect; and suicidal ideations and suicide attempts;

-42-

4.    Create or revise, as appropriate, and implement
policies and procedures regarding the creation,
preservation, and organization of all records relating
to the care and/or treatment of patients, including
measures to address improper removal, destruction,
and/or falsification of any record;

5.    Create or revise, as appropriate, and implement
thresholds for patient injury/event indicators,
including patient-against-patient assaults,
self-injurious behavior, and falls, that will initiate
review at both the unit/treatment team level and at the
appropriate supervisory level and that will be
documented in the patient medical record with
explanations given for changing/not changing the
patient's current treatment regimen;

6.    Create or revise, as appropriate, and implement
policies and procedures addressing the investigation of
serious incidents. Such policies and procedures shall
include requirements that investigations of such
incidents be undertaken and that they be comprehensive,
include consideration of staff's adherence to
programmatic requirements, and be performed by
independent investigators;

7.    Require all staff involved in conducting investigations
to complete successfully competency-based training on
technical and programmatic investigation methodologies
and documentation requirements necessary in mental
health service settings;

8.    Monitor the performance of staff charged with
investigative responsibilities, and provide technical
assistance and training, whenever necessary to ensure
the thorough, competent, and timely completion of
investigations of serious incidents;

9.    Develop and implement a reliable system to identify the
need for, and monitor the implementation of,
appropriate corrective and preventative actions
addressing problems identified as a result of
investigations;

10.   Review, revise, as appropriate, and implement policies
and procedures related to the tracking and trending of
incident data, including data from patient aggression
and abuse and neglect allegations, to ensure that such
incidents are properly investigated and appropriate

a plan of care that outlines specific strategies, with rationales, including adjustment of medication regimens and initiation of specific treatment interventions.

b.    Ensure that psychiatric reassessments are completed within time-frames that reflect the patient's needs, including prompt reevaluations of all patients requiring restrictive interventions.

c.    Develop diagnostic practices, consistent with generally accepted professional standards, for reliably reaching the most accurate psychiatric diagnoses.

d.    Conduct interdisciplinary assessments of patients consistent with generally accepted professional standards, and ensure that nursing assessments in particular are adequately thorough and individualized.  Expressly identify and prioritize each patient's individual mental health problems and needs, including, without limitation, maladaptive behaviors and substance abuse problems.

e.    Develop a clinical formulation of each patient that integrates relevant elements of the patient's history, mental status examination, and response to current and past medications and other interventions, and that is used to prepare the patient's treatment plan.

f.    Ensure that the information gathered in the assessments and reassessments is used to justify and update diagnoses, and establish and perform further assessments for a differential diagnosis.

g.    Review and revise, as appropriate, psychiatric assessments of all patients, providing clinically justified current diagnoses for each patient, and removing all diagnoses that cannot be clinically justified.  Modify treatment and medication regimens, as appropriate, considering factors such as the patient's response to treatment, significant developments in the patient's condition, and changing patient needs.

h.      Develop a monitoring instrument to ensure a
        systematic review of the quality and timeliness of
        all assessments according to established
        indicators, including an evaluation of initial
        assessments, progress notes, and transfer and
        discharge summaries, and require each clinical
        discipline's peer review system to address the
        process and content of assessments and
        reassessments, identify individual and group
        trends, and provide corrective action.

2.  <u>Treatment Planning</u>

   The KCHC shall develop and implement an integrated treatment
planning process consistent with generally accepted professional
standards.  More particularly, the KCHC shall:

a.      Develop and implement policies and procedures
        regarding the development of individualized
        treatment plans consistent with generally accepted
        professional standards of care;

b.      Review and revise, as appropriate, each patient's
        treatment plan to ensure that it is current,
        individualized, factors in the patient's
        particular strengths, is outcome-driven, emanates
        from an integration of each discipline's
        assessments of patients, and that goals and
        interventions are consistent with clinical
        assessments.  Revise each patient's treatment plan
        if it is not effective.

c.      Require all clinical staff to complete
        successfully competency-based training on the
        development and implementation of individualized
        treatment plans, including skills needed in the
        development of clinical formulations, needs, goals
        and interventions as well as discharge criteria.

d.      Ensure that individualized treatment plans are
        implemented in a consistent manner in accordance
        with generally accepted professional practices.

e.      Ensure that the medical director timely reviews
        high-risk situations such as individuals requiring
        repeated use of seclusion and restraints.

f.   Provide adequate and appropriate psychiatric and
     other mental health services, including adequate
     psychological services and behavioral management,
     in accordance with generally accepted professional
     standards.  Behavioral management should focus on
     teaching alternative, adaptive behaviors.

g.   Develop and implement psychological evaluations to
     assess each patient's cognitive deficits and
     strengths to ensure that treatment interventions
     are selected based on the patient's capacity to
     benefit.

h.   Develop and implement treatment goals that will
     establish an objective, measurable basis for
     evaluating patient progress.

i.   Develop and implement policies to ensure that
     patients who are dually diagnosed as mentally
     ill/developmental disabilities or mentally
     ill/substance abuse, and patients with behavioral
     problems, are appropriately evaluated, treated,
     and monitored in accordance with generally
     accepted professional standards.

j.   For patients identified as suicidal, develop and
     implement a clear and uniform policy for patient
     assessment and treatment.

k.   Ensure that staff receive adequate training to
     serve the needs of patients requiring specialized
     care.

     Such training shall include:

     1.   competence in performing behavioral
          assessments, including the functional
          analysis of behavior and appropriate
          identification of target and replacement
          behaviors;

     2.   the development and implementation of clear
          thresholds for behaviors or events that
          trigger referral for a behavioral assessment;

     3.   timely review of behavioral assessments by
          treatment teams, including consideration or
          revision of behavioral interventions, and

     ...ure that treatment plans are consistently
     assessed for their efficacy and reviewed and
     revised when appropriate.

     o.   Ensure that th...

-47-

documentation of the team's review in the patient's record;

4.   the development and implementation of protocols for collecting objective data on target and replacement behaviors; and

5.   assessments of each patient's cognitive deficits and strengths to ensure that treatment interventions are selected based on the patient's capacity to benefit.

l.   Ensure full participation by the patient in the treatment planning process.

m.   Ensure that treatment plans address repeated admissions and adjust the plans accordingly to examine and address the factors that led to re-admission.

n.   Ensure that treatment plans are consistently assessed for their efficacy and reviewed and revised when appropriate.

o.   Ensure that the treatment planning process is guided by a multi-disciplinary team in which diverse professional expertise and observations are employed, in an inter-disciplinary process, to evaluate patients and develop treatment plans.

## 3.   Medication Management and Monitoring

KCHC shall provide adequate psychiatric supports and services for the treatment of its patients, including medication management and monitoring of medication side-effects in accordance with generally accepted professional standards.  More particularly, KCHC shall:

a.   Develop and implement policies and procedures requiring clinicians to document their analyses of the benefits and risks of chosen treatment interventions;

b.   Ensure that the treatment plans at KCHC include a psychopharmacological plan of care that includes information on purpose of treatment, type of medication, rationale for its use, target behaviors, and possible side effects.  KCHC should also reassess

-48-

the diagnosis in those cases that fail to respond to repeat drug trials.

c.  Ensure that all psychotropic medications are:

1.  prescribed in therapeutic amounts;

2.  tailored to each patient's individual symptoms;

3.  monitored for efficacy against clearly-identified target variables and time frames;

4.  modified based on clinical rationales; and

5.  properly documented.

d.  Institute systematic monitoring mechanisms regarding medication use throughout the facility.  In this regard, KCHC shall:

1.  Develop, implement, and continually update a complete set of medication guidelines in accordance with generally accepted professional standards that address the indications, contraindications, screening procedures, dose requirements, and expected individual outcomes for all psychiatric medications in the formulary;

2.  Ensure that the pharmacological component of a treatment plan reflects the exercise of professional judgement for medication treatment including:  diagnosis, target symptoms, risks and benefits of particular medications, and consideration of alternate treatments;

3.  Ensure that the rationale for each patient's course of treatment is included in the physician's progress notes;

4.  Ensure that psychotropic medications are used as an integral part of a treatment program to manage specific behaviors in the least restrictive manner, to eliminate targeted behaviors/symptoms, and to treat specific psychiatric disorders;

5.  Develop and implement a policy and procedure governing the use of PRN medications that includes requirements for specific identification of the behaviors that result in PRN administration of

medications, a time limit on PRN uses, a documented rationale for the use of more than one medication on a PRN basis, and physician documentation to ensure timely, critical review of the patient's response to PRN treatments and reevaluation of regular treatments as a result of PRN uses;

6. Develop and implement a policy and procedure, in accordance with generally accepted professional standards, governing clinical justification of polypharmacy, which should include attention to the special risks associated with the use of benzodiazepines, anticholinergic agents, and conventional and atypical antipsychotic medications;

7. Ensure that all medications, in accordance with generally accepted professional standards, are being prescribed for their specific purpose and not solely for their secondary effects.

8. Adopt and incorporate the necessary protections and safeguards to ensure that patients are afforded safe and effective pharmacological treatment. To this end, KCHC shall, at a minimum, establish mechanisms to:

   a. monitor practitioners' adherence to specific and current guidelines in the use of each medication;

   b. report and analyze adverse drug reactions; and

   c. report, analyze, and document actual and potential variations in the prescription, transcription, procurement/storage, dispensing and administration of medications.

C. Behavioral Management

KCHC should ensure the use of systematic behavior (social learning) strategies. To this end, KCHC should:

1. Ensure that behavioral plans, in accordance with generally accepted professional standards, contain certain basic elements, including:

-50-

     a.   an analysis of the reasons for the behavior and
its frequency and causes;

     b.   identification of specific interventions developed
and implemented by trained staff in order to
address and modify the behavior; and

     c.   full integration of the behavior plan into the
patient's overall plan of care.

2.   Ensure that close observation and restraints are used
in accordance with generally accepted professional
standards.  Absent exigent circumstances -- i.e., when
a patient poses an imminent risk of injury to himself
or a third party -- any device or procedure that
restricts, limits or directs a person's freedom of
movement (including, but not limited to, chemical
restraints, mechanical restraints, physical/manual
restraints, time out procedures, and over-reliance on
the use of close observation) should be used only after
other less restrictive alternatives have been assessed
and exhausted.  To this end, KCHC should:

3.   Ensure that restraints:

     a.   Are used only when persons pose an immediate
threat to themselves or others and after a
hierarchy of less restrictive measures has been
exhausted;

     b.   Are not used in the absence of, or as an
alternative to, active treatment, as punishment,
or for the convenience of staff;

     c.   Are not used as part of a behavioral intervention;

     d.   Are terminated as soon as the person is no longer
an imminent danger to himself or others; and

     e.   Are used in a reliably documented manner.

4.   Create or revise, as appropriate, and implement
policies and procedures consistent with generally
accepted professional standards that cover the
following areas:

     a.   The range of restrictive alternatives available to
staff and a clear definition of each; and

-51-

    b.    The training that all staff receive in the management of the patient crisis cycle, the use of restrictive measures, and the use of less-restrictive interventions.

    c.    Limitations on the use of four-point restraints and STAT emergency medications to address patient behaviors.

5.    Ensure that if restraint is initiated, the patient is assessed within an appropriate period of time and an appropriately trained staff member makes a determination of the need for continued restraint.

6.    Ensure that a physician's order for restraint includes:

    a.    The specific behaviors requiring the procedure;

    b.    The maximum duration of the order; and

    c.    Behavioral criteria for release, which, if met, require the patient's release even if the maximum duration of the initiating order has not expired.

7.    Ensure that the patient's attending physician is promptly consulted regarding the restrictive intervention.

8.    Ensure that at least every thirty minutes, patients in restraint are re-informed of the behavioral criteria for their release from the restrictive intervention.

9.    Ensure that immediately following a patient being placed in restraint, the patient's treatment team reviews the incident, and the attending physician documents the review and the reasons for or against change in the patient's current pharmacological, behavioral, or psychosocial treatment.

10.    Comply with 42 C.F.R. § 483.360(f) as to assessments by a physician or licensed medical professional of any resident placed in restraints.

11.    Ensure that staff successfully complete competency-based training regarding implementation of seclusion and restraint policies and the use of less-restrictive interventions.

-52-

12. Ensure that, with respect to the use of close observation:

   a. Develop and implement a comprehensive policy and procedure that would restrict the use of close observation to only those situations where it is necessary to protect a patient from self-harm or harm to others;

   b. Ensure that staff successfully complete competency-based training on the correct application of close observation.

   c. Develop a quality improvement mechanism to monitor the use of close observation.

13. Ensure that KCHC will not transfer patients between psychiatric units in lieu of proper treatment.  To this end, KCHC shall:

   a. develop and implement a comprehensive policy and procedure that would limit the transfer of patients from one unit to another in lieu of proper treatment and require that all such transfers be approved centrally;

   b. review and assess the necessity of all transfers with members of the treatment teams and the patient.  In this review, the problem behaviors and effective and ineffective intervention strategies should be discussed and the efficacy of transfer be evaluated.

D.  Medical and Nursing Care

   KCHC shall provide medical and nursing services to its patients consistent with generally accepted professional standards.  Such services shall result in KCHC patients receiving individualized services, supports, and therapeutic interventions, consistent with their treatment plans.  More particularly, KCHC shall:

   1. Ensure adequate clinical leadership to ensure that professional standards of practice are maintained.

-53-

2.  Ensure that patients are provided adequate medical care
    in accordance with generally accepted professional
    standards.

3.  Develop and implement appropriate policies and
    procedures, in accordance with general accepted
    professional standards, to ensure adequate medical and
    nursing assessments and monitoring.

4.  Ensure that, before they work directly with patients,
    all nursing staff have successfully completed
    competency-based training regarding mental health
    diagnoses, related symptoms, psychotropic medications,
    identification of side effects of psychotropic
    medications, monitoring of symptoms and target

    variables, and documenting and reporting of the
    patient's status.

5.  Ensure that nursing staff monitor, document, and report
    accurately and routinely, patients' symptoms and target
    variables in a manner that enables treatment teams to
    assess the patient's status and to modify, as
    appropriate, the treatment plan.

6.  Ensure that nursing staff actively participate in the
    treatment team process and provide feedback on
    patients' responses, or lack thereof, to medication and
    behavioral interventions.

7.  Ensure that each patient's treatment plan identifies:

    a.  The diagnoses, treatments, and interventions that
        nursing and other staff are to implement;

    b.  The related symptoms and target variables to be
        monitored by nursing and other unit staff; and

    c.  The frequency by which staff need to monitor such
        symptoms.

8.  Establish an effective infection control program to
    prevent the spread of infections or communicable
    diseases.

9.  Establish an effective emergency preparedness program,
    including appropriate staff training; staff awareness
    of emergency materials and their location; and
    conducting sufficient practice codes to be able to

-54-

perform in a competent fashion when confronted with an actual emergency.

10.   Provide and maintain adequate medical documentation in accordance with generally accepted professional standards.  Ensure that all clinical records are complete, accurately documented, readily accessible, and systematically organized.

11.   Develop and maintain an integrated system to monitor and ensure quality of care across all aspects of care and treatment, including adequate systems for data capture, retrieval, and statistical analysis to identify and track trends.  The program also should include a process for developing a corrective action

plan and a process for monitoring the effectiveness of corrective measures that are taken.

E.   Fire and Life Safety

In order to provide patients with the environmental safety and security that generally accepted professional standards require, KCHC shall, at a minimum:

1.   Develop and implement adequate policies and procedures regarding fire prevention including emergency planning and drills.

2.   Ensure that emergency drills are conducted on a regular basis.

3.   Implement competency based testing for staff regarding fire/emergency procedures.

4.   Ensure that emergency keys are appropriately marked, available, and consistently stored in a quickly accessible location.

5.   Develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials.

6.   Destroy any linens that cannot be sanitized sufficiently to kill any possible bacteria.  Inspect and replace all worn linens as often as necessary.

7.   Develop and implement policies and procedures for laundering, disinfecting, and appropriately storing patients' extra personal clothing until the patients' discharge.

8.   Ensure that laundry is washed and dried at the
     proper temperatures and the laundry delivery
     procedures protect patients from exposure to
     contagious disease, bodily fluids, and pathogens by
     preventing clean laundry from coming into contact
     with dirty laundry or contaminated surfaces.

9.   Develop and implement policies and procedures to
     ensure adequate cleaning of the facilities with
     meaningful inspection processes and documentation.
     Such policies should include oversight and
     supervision, as well as establish daily cleaning
     requirements for toilets, showers, housing areas,
     and other areas accessible to patients.

10.  Provide training for food service workers in the
     areas of food safety and food handling to reduce the
     risk of food contamination and food-borne illnesses.

11.  Ensure that foods are served and maintained at
     proper temperatures.

F.   Discharge Planning

     KCHC shall actively pursue the appropriate discharge of
patients and ensure that patients receive services in the most
integrated, appropriate setting that is consistent with their
needs.  More particularly, KCHC shall:

1.   Identify at admission and address in treatment
     planning the criteria that likely will foster viable
     discharge for a particular patient, including but
     not limited to:

     a.   The individual patient's symptoms of mental
          illness or psychiatric distress;

     b.   Any other barriers preventing that specific
          patient from transitioning to a more integrated
          environment, especially difficulties raised in
          previously unsuccessful placements; and

     c.   The patient's strengths, preferences, and
          personal goals.

2.   Include in treatment interventions the development
     of skills necessary to live in the setting in which

the patient will be placed, and otherwise prepare
the patient for his or her new living environment.

3.      Provide the patient adequate assistance in
        transitioning to the new setting;

4.      Ensure that professional judgments about the most
        integrated setting appropriate to meet each
        patient's needs are implemented and that appropriate
        aftercare services are provided that meet the needs
        of the patient in the community.

5.      Ensure that the patient is an active participant in
        the placement process.

6.      Create or revise, as appropriate, and implement a
        quality assurance or utilization review process to
        oversee the discharge process and aftercare
        services.

7.      Ensure that appropriate steps are taken to provide
        continuity of care with appropriate community
        providers in order to prevent decompensation and
        reinstitutionalization.

G.   KCHC Hospital Police Policies, Procedures and Practices[40]

     KCHC shall provide policing services that comport with the
requirements of the United States Constitution and laws, as well
as with generally accepted professional standards for hospital
security services.  To that end, KCHC should:

1.      Develop a coherent, comprehensive, integrated set of
        Hospital Police policies and practices that provides
        clear guidance for officer conduct, including but
        not limited to policies to guide Hospital Police
        officers' interactions with psychiatric inpatients,
        and Hospital Police officers' use of force;

2.      Develop a comprehensive training program, including
        adequate field training for new officers and
        adequate in-service training for all officers;

3.      Develop comprehensive policies and procedures on

_____

     [40]   This is a general list of remedies as a more specific
assessment will be provided under separate cover.

-57-

           supervisory oversight of line officers, including
supervisory review of use of force and other
incidents; and

4.    Establish an adequate record management system
whereby all incidents involving the Hospital Police,
including but not limited to uses of force, as well
as all other types of interactions with patients,
are documented, recorded, assigned discrete control
numbers, and investigated where appropriate.

## V. CONCLUSION

Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website.[41]
Although we will provide a copy of this letter to any individual
or entity upon request, as a matter of courtesy, we will not post
this letter on the Civil Rights Division's website until ten
calendar days from the date of this letter.

We hope to continue working with the City, HHC, and KCHC in
an amicable and cooperative fashion to resolve our concerns
expressed in this letter. Assuming that our cooperative
relationship continues, we are willing to send our consultants'
written evaluations -- which are not public documents -- under
separate cover. Although the consultants' reports do not
necessarily reflect the official conclusions of the Department of
Justice, the observations, analysis, and recommendations
contained therein provide further elaboration of the issues
discussed in this letter and offer practical technical assistance
to help address them. We hope that you will give this
information careful consideration and that it will assist in
facilitating a dialogue addressing the areas that require
attention.

---

[41]   http://www.usdoj.gov/crt/split/

-58-

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA and § 14141 to correct deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them. 42 U.S.C. § 1997b(a)(1). We would prefer, however, to resolve this matter by working cooperatively with the City and are confident that we will be able to do so. The DOJ lawyers assigned to this investigation will be contacting the City's attorneys to discuss this matter in further detail. If you have any questions regarding this letter, please call Tammie M. Gregg, Deputy Chief of the Civil Rights Division's Special Litigation Section, at (202) 616-2009, or Michael J. Goldberger, Chief of Civil Rights, Civil Division, in the United States Attorney's Office, Eastern District of New York, at (718) 254-6052.

Sincerely,

Benton J. Campbell
United States Attorney
Eastern District of New York

Loretta King
Acting Assistant Attorney
General

cc:   Michael A. Cardozo, Esq.
      Corporation Counsel

      Alan D. Aviles
      President
      New York City Health and Hospitals Corporation

      Richard A. Levy
      General Counsel
      New York City Health and Hospitals Corporation

      Jean Leon
      Executive Director
      Kings County Hospital Center

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA and § 14141 to correct deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them.  42 U.S.C. § 1997b(a)(1).  We would prefer, however, to resolve this matter by working cooperatively with the City and are confident that we will be able to do so.  The DOJ lawyers assigned to this investigation will be contacting the City's attorneys to discuss this matter in further detail.  If you have any questions regarding this letter, please call Tammie M. Gregg, Deputy Chief of the Civil Rights Division's Special Litigation Section, at (202) 616-2009, or Michael J. Goldberger, Chief of Civil Rights, Civil Division, in the United States Attorney's Office, Eastern District of New York, at (718) 254-6052.

Sincerely,

Benton J. Campbell
United States Attorney
Eastern District of New York

Loretta King
Acting Assistant Attorney
General

cc:  Michael A. Cardozo, Esq.
Corporation Counsel

Alan D. Aviles
President
New York City Health and Hospitals Corporation

Richard A. Levy
General Counsel
New York City Health and Hospitals Corporation

Jean Leon
Executive Director
Kings County Hospital Center