## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>      v.<br><br>THE CITY OF NEW YORK,<br>NEW YORK CITY HEALTH AND HOSPITALS<br>CORPORATION, ALAN AVILES, PRESIDENT,<br>NEW YORK CITY HEALTH AND HOSPITALS<br>CORPORATION, in his official capacity,<br>ANTONIO MARTIN, EXECUTIVE<br>DIRECTOR, KINGS COUNTY HOSPITAL<br>CENTER, in his official capacity, and<br>JOSEPH MERLINO, DEPUTY EXECUTIVE<br>DIRECTOR FOR BEHAVIORAL HEALTH<br>SERVICES, KINGS COUNTY HOSPITAL, in<br>his official capacity,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CV10- 0060**

Civil No. _____

MATSUMOTO, J.

LEVY M.J.

## CONSENT JUDGMENT

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................. 1

II.  DEFINITIONS ................................................................................................................ 2

III.  SUBSTANTIVE PROVISIONS ...................................................................................... 3

    A.  Protection From Harm ........................................................................................... 3

    B.  Mental Health Care ............................................................................................... 6

        1. Assessments and Diagnoses ............................................................... 6
        2. Treatment Planning ............................................................................. 8
        3. Medication Management and Monitoring ........................................... 12

    C.  Behavioral Management ...................................................................................... 14

    D.  Medical and Nursing Care .................................................................................. 17

    E.  Quality Assurance/Performance Improvement ...................................................... 19

    F.  Fire and Life Safety ........................................................................................... 19

    G.  Discharge And Aftercare Planning ...................................................................... 20

    H.  KCHC Hospital Police Policies, Procedures and Practices ..................................... 23

    I.  Training and Policy Manuals and Accountability .................................................. 24

IV.  IMPLEMENTATION OF AND COMPLIANCE WITH THIS AGREEMENT ..................................................................... 24

V.  MODIFICATION AND TERMINATION ......................................................................... 27

VI.  GENERAL PROVISIONS ............................................................................................. 29

# I.  INTRODUCTION

A.   This Consent Judgment ("Agreement") is entered into between the United States of America ("United States") and the City of New York ("NYC"), the New York City Health and Hospitals Corporation ("HHC"), Alan Aviles, President of HHC, in his official capacity, Kings County Hospital Center ("KCHC"), Antonio Martin, as Executive Director of KCHC and Joseph Merlino, as Deputy Executive Director for Behavioral Health Services at KCHC (collectively, "Defendants").

This Agreement addresses the results of the United States' investigation into the conditions of care and treatment of mental health patients (hereinafter, "Patients") at KCHC's behavioral health units, i.e., its psychiatric inpatient units and the emergency psychiatric unit (the Comprehensive Psychiatric Emergency Program, or "CPEP," which includes the psychiatric emergency service and the Extended Observation Unit ("EOU")) in Brooklyn, New York, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and the Violent Crime and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (" § 14141").

B.   The United States commenced its investigation into conditions at KCHC's behavioral health units (hereinafter, "KCHC" shall refer to KCHC's behavioral health units only, unless otherwise indicated) on December 7, 2007, when the United States notified Defendants, pursuant to CRIPA and § 14141, of its investigation.  The United States conducted on-site inspections of KCHC on May 20-23, 2008, July 28-August 1, 2008, and September 18-19, 2008.  By letter dated January 30, 2009, the United States notified NYC of the findings of its investigation concerning KCHC (the "findings letter").

C.   It is the position of the United States that in its care and treatment of Patients, KCHC violates the rights of these Patients that are secured or protected by the United States Constitution and the laws of the United States.

D.   Each and every provision of this Agreement is entered into by agreement of the Parties, after thorough negotiations.  The purpose of this Agreement is to achieve the substantive outcomes set forth within this Agreement.

E.   The Parties agree that the provisions of this Agreement are a lawful, fair, adequate, and reasonable resolution of this investigation.

F.   In entering into this Agreement, Defendants do not admit any violation of the United States Constitution or federal law.  This Agreement shall not be used as evidence of liability in any other legal proceeding.

G.   Nothing in this Agreement shall be construed as an acknowledgment or admission by the United States that Defendants have acted, or continue to act, in full compliance with the United States Constitution or federal law.

H.   This Agreement is binding on Defendants and their agencies, departments, successors, or independent contractors including agents and/or assigns that may have responsibility for implementation of the requirements of this agreement, either currently or in the future.

## II. DEFINITIONS

As used in this Agreement, the following definitions apply to the terms below, without regard to case, gender, tense, or number:

A.   "Adequate" or "appropriate" shall mean that level of service required for compliance with all applicable federal laws and regulations, and with generally accepted professional standards.

B.   "Competency-based training" shall mean the provision of knowledge and skills sufficient to enable the trained person to meet specified standards of performance as validated by that person's demonstration that he or she can use such knowledge or skills effectively in the circumstances for which they are required.

C.   "Consistent with generally accepted professional standards" shall mean a decision by a qualified professional that substantially complies with and is based upon contemporary, accepted professional judgment, practice, or standards.

D.   "CPEP" shall mean the Emergency Psychiatric Service and the Extended Observation Unit ("EOU") of Kings County Hospital Center's Comprehensive Psychiatric Emergency Program.

E.   "Effective Date" shall be the date on which this Agreement is entered as an order of the Court.

F.   "HHC" shall mean the New York City Health and Hospitals Corporation, its agencies, departments, or their successors or designees, and HHC's employees, agents, or assigns.

G.   Mental Hygiene Legal Service ("MHLS") shall mean the plaintiff and his counsel in *Hirschfeld o/b/o L.D. et al. v. New York City Health and Hospitals Corp., et al.*, Civil Action No. CV-07-1819 (KAM) (E.D.N.Y. May 2, 2007).

H.   "Patients" shall mean behavioral health patients at KCHC's psychiatric inpatient units and the CPEP.

I.   "Physician" shall mean a person licensed to practice medicine in the State of New York.

J.   "Psychiatrist" shall mean a physician licensed to practice medicine in New York State who: (a) is a diplomate of the American Board of Psychiatry and Neurology or is eligible to be certified by that board; or (b) is certified by the American Osteopathic Board of Neurology and Psychiatry or is eligible to be certified by that board, as defined by New York State Mental Hygiene Law § 9.01.

K.   "Psychotropic medication" shall mean any substance used in the treatment of mental illness which exerts an effect on the mind and is capable of modifying mental activity or behavior.

L.   "Qualified Professional" shall mean an individual who is competent, whether by education, training, or experience, to make the particular decision at issue.

2

M.   "Registered Nurse" or "RN" shall mean an individual licensed as a registered professional nurse by the State of New York.

N.   "Restraint" shall mean any device or procedure that restricts, limits, or directs a person's freedom of movement, including, but not limited to, chemical, mechanical, or physical/manual restraints.

O.   "Sentinel Event" shall mean an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof.  The phrase, "or the risk thereof" includes any process variation for which a recurrence would carry a significant chance of a serious adverse outcome.  Such events are called "sentinel" because they signal the need for immediate investigation and response.

P.   "The City" or "NYC" shall mean the City of New York, its agencies, departments, or their successors or designees, and the City's employees, agents, or assigns.

Q.   "Treatment Plan" shall mean a document or a portion of a document (which can include an Electronic Medical Record) which sets out, in an integrated and coherent manner, all of the individualized treatments, protections, support services, and activities to be provided to the Patient; is periodically reviewed; is revised as appropriate; is based upon comprehensive assessments performed by an interdisciplinary team comprised of qualified professionals in accordance with generally accepted professional standards; reflects, to the fullest extent practical, the Patient's input and family input (where appropriate), preferences, strengths, and needs; and specifies methods to track and document progress toward identified goals and objectives.

R.   "United States" shall mean the Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the Eastern District of New York, and their employees, agents, assigns, or successors.

### III.  SUBSTANTIVE PROVISIONS

To remedy the deficiencies discussed in the findings letter and protect the constitutional and federal statutory rights of Patients at Kings County Hospital Center, Defendants shall promptly implement the minimum remedial measures set forth below:

A.   <u>Protection From Harm</u>

KCHC shall provide its Patients with a safe and humane environment and protect them from harm.  At a minimum, KCHC shall:

1.   Create or revise, as appropriate, and implement, in accordance with generally accepted professional standards, policies and procedures for the monitoring and supervision of Patients, especially Patients at risk, and ensure that all policies and procedures are integrated into routine assessment, re-assessment, and treatment planning.

3

2. Create or revise, as appropriate, and implement policies and procedures that comport with generally accepted professional standards to address:

   a. Reduction of violence and Patient aggressive and assaultive behaviors, including, but not limited to, sexual assaults. Such policies and procedures shall include, but not be limited to, training of appropriate staff members in prevention and management of assaultive and aggressive behavior, including de-escalation techniques;

   b. Patients expressing suicidal ideation; and

   c. Patients who attempt self-harm.

3. Create or revise, as appropriate, and implement comprehensive, consistent incident management policies and procedures that provide clear guidance regarding reporting requirements and the categorization of incidents, including those involving any physical injury; Patient aggression; abuse and neglect of Patients by staff; and suicidal ideation and suicide attempts. These policies and procedures will include the mandatory requirement that staff with knowledge of such incidents report them; the establishment of means to anonymously report the improper removal, destruction, modification and/or falsification of any record; and specific processes by which these reports will be recorded and immediately investigated by a named individual or individuals accountable for investigation and resolution of the report.

4. Create or revise, as appropriate, and implement policies and procedures regarding the creation, preservation, and organization of all records relating to the care and/or treatment of Patients, including measures to address accuracy of data and improper removal, destruction, and/or falsification of any record.

5. Create or revise, as appropriate, and establish and implement thresholds that will initiate substantive review for Patient injury events, including Patient-against-Patient assaults, Patient-against-staff assaults, self-injurious behavior, and falls. Such review shall take place at both the unit and treatment team level and at the appropriate supervisory level and will be documented in the Patient's medical record with explanations given for changing/ not changing the Patient's current treatment regimen.

6. Create or revise, as appropriate, and implement policies and procedures addressing the investigation of serious incidents. "Serious incidents" shall include, but not be limited to: Patient death; abuse or neglect of a Patient; serious Patient injury, including injuries resulting from suicide attempts and other self-injurious behaviors; sentinel events; and other incidents which result in significant harm to Patients or imminently threaten the safety of Patients. Such policies and procedures shall include requirements that comprehensive investigations of such incidents be undertaken; that upon learning of the incident, KCHC will promptly notify the United States and MHLS; that federal reporting and state regulatory requirements and guidelines regarding deaths caused by restraints will be followed; and that the Patient[s] involved will be interviewed, if possible, as part of the investigation. These investigations will include consideration of staff's adherence to programmatic requirements and federal and state regulatory requirements and guidelines, and be performed by independent investigators.

4

Independent investigators means investigators who have not been involved in the incident or part of the decision making process for the incident or event which is under investigation.

7.   Require all staff involved in conducting investigations to successfully complete competency-based training on technical and programmatic investigation methodologies and documentation requirements necessary in mental health service settings.

8.   Monitor the performance of staff charged with investigative responsibilities, and provide technical assistance and training, whenever necessary, to ensure the thorough, competent, and timely completion of investigations of serious incidents.

9.   Develop and implement a reliable system to identify the need for, and monitor the implementation of, appropriate corrective and preventative actions addressing problems identified as a result of investigations of incidents involving Patient harm.

10.  Review, revise as appropriate, and implement policies and procedures related to the tracking and trending of incident data, including data from Patient aggression and abuse and neglect allegations, and reports as described in paragraph 3 above, to ensure that such incidents are properly investigated and appropriate corrective actions are identified and implemented in response to both individual incidents and problematic trends.

11.  Develop and implement a comprehensive quality assurance/performance improvement system consistent with generally accepted professional standards. At a minimum, such a system shall:

   a.   Collect information related to the adequacy of the provision of the protections, treatments, services, and supports provided by KCHC, as well as the outcomes being achieved by Patients;

   b.   Analyze the information collected in order to identify strengths and weaknesses within the current system; and

   c.   Identify and monitor implementation of corrective and preventative actions to address identified issues and ensure resolution of underlying problems.

12.  Conduct a thorough review of all units to identify any potential environmental safety hazards, and develop and implement a plan to remedy any identified issues. At a minimum, KCHC shall:

   a.   Ensure that suicidal Patients are housed in an area that is safe for them, with appropriate supervision and observation by staff;

   b.   Identify and eliminate suicide hazards to the fullest extent possible in all areas accessible to Patients, including Patient bedrooms and bathrooms.

B.   Mental Health Care

1. Assessments and Diagnoses

KCHC shall ensure that its Patients receive accurate, complete, and timely assessments and diagnoses, consistent with generally accepted professional standards, and that these assessments and diagnoses drive treatment interventions.  More particularly, KCHC shall:

a.   Develop and implement policies and procedures regarding triage in the CPEP, including, but not limited to policies and procedures regarding:

(i)   The timing of triage for Patients upon entering the CPEP;

(ii)   Forms to be used in conducting triage;

(iii)   Determinations regarding whether a Patient should be retained if she desires to leave the CPEP;

(iv)   Individuals determined to have mental retardation or developmental disabilities;

(v)   Individuals determined to be intoxicated;

(vi)   Individuals determined to be at risk for violence and/or predatory behavior;

(vii)   Individuals determined to evidence suicidal ideation or self-harm behaviors;

(viii)   Individuals with acute medical conditions;

(ix)   Re-evaluation of Patients and status updates of Patients while in the CPEP regularly and as appropriate; and

(x)   Treatment of minors in the CPEP, including identification, escort and oversight protocols; designation of separate waiting and examination areas for minors; and access to therapy with family participation.

b.   Develop and implement comprehensive policies and procedures regarding the timeliness and content of initial psychiatric assessments and ongoing re-assessments; and ensure that assessments include a plan of care, including the treatment plan, that outlines specific strategies, with rationales, including adjustment of medication regimens and initiation of specific treatment interventions.  With respect to any Patient deemed to need inpatient admission, such policies and procedures shall provide for at least one re-evaluation, every eight hours for all Patients who remain in the CPEP following the initial determination of the need for inpatient admission.

6

c.   Ensure that psychiatric re-assessments are completed within time frames that reflect the Patient's needs, including prompt re-evaluations of all Patients requiring restrictive interventions.

d.   Develop and implement psychiatric diagnostic practices consistent with generally accepted professional standards.

e.   Conduct interdisciplinary assessments of Patients which are thorough and individualized and which are consistent with generally accepted professional standards, including, but not limited to, psychology and nursing assessments where indicated. Expressly identify and prioritize each Patient's individual mental health problems and needs, including, but not limited to, maladaptive behaviors, substance abuse problems, trauma history, where clinically appropriate, medical problems, and social and service needs including housing and transportation.

f.   Develop a clinical formulation of each Patient that integrates relevant elements of the Patient's history, mental status examination, and response to current and past medications and other interventions, including community and family supports and is used to prepare the Patient's treatment plan.

g.   Ensure that the information gathered in the assessments and re-assessments is used to refine diagnoses over time. Ensure that, if a Patient's condition changes over time, any continued assessment which is performed results in new or additional diagnoses, where appropriate.

h.   Review and revise, as appropriate, psychiatric assessments of all Patients, providing clinically justified current diagnoses for each Patient, and removing all diagnoses that cannot be clinically justified.

i.   Modify treatment and medication regimens, as appropriate, considering factors such as the Patient's response to treatment, significant developments in the Patient's condition, and changing Patient needs.

j.   Develop and implement a monitoring instrument to ensure a systematic review of the quality and timeliness of all assessments and re-assessments according to established indicators, including an evaluation of initial assessments, progress notes, and transfer and discharge summaries, and require each clinical discipline's peer review system to address the process and content of assessments and re-assessments, identify individual and group trends, and provide corrective action.

k.   Ensure that, for Patients with limited English proficiency ("LEP", i.e., an individual whose primary language is not English and who has a limited ability to read, write, speak or understand English) or a disability that affects communication, all significant medical and clinical interactions with Patients, including treatments, obtaining informed consent for medications, treatment planning, discharge planning, and information about rights, are as effective as communications with others and are conducted in the Patient's language of

preference.  Whenever possible, communication services will be conducted on a face-to-face basis using qualified speakers or interpreters.  With respect to a Patient with a disability that affects communication, primary consideration shall be given to the Patient's requested auxiliary communication aid or service.  If factors such as an emergency or time constraints arise, other appropriate interpretive and/or translation services may be used to ensure effective communication.

l.     Ensure that within seven days of admission or when mental status permits, all school-age children receive as part of the comprehensive interdisciplinary admission process an evaluation of cognitive functioning performed by or under the supervision of a licensed psychologist.  If performed under the supervision of a licensed psychologist, the individual performing the assessment will have received appropriate training in psychological assessment and be currently enrolled in a doctoral degree granting program in psychology.  At minimum, this evaluation will include a review of all prior and available psychological/psychiatric records, cognitive and academic achievement testing records, a review of available academic records, a thorough mental status examination, including cognitive screening to gain an estimate of basic cognitive ability.

(i)     Ensure that once the treatment team has all necessary information, if clinically warranted and deemed appropriate for treatment and discharge planning, identified school-age children will undergo formal cognitive and/or academic achievement testing to assess current cognitive and academic functioning.

(ii)    Ensure that, where appropriate, Defendants coordinate with the New York City Department of Education to provide required educational services to all school-age children.

2.  Treatment Planning

KCHC shall develop and implement an integrated treatment planning process consistent with generally accepted professional standards.  More particularly, KCHC shall:

a.     Either prior to admission or within 24 hours of an individual's admission to the inpatient service, ensure that the individual receives an admission psychiatric evaluation that includes:

(i)     Psychiatric history, including a review of presenting symptoms;

(ii)    Complete mental status examination;

(iii)   Admission diagnoses;

(iv)    Laboratory tests ordered;

8

    (v)       Consultations ordered; and

    (vi)      Consideration of co-occurring medical conditions and physical status, including a review of the medical admission history and physical examinations conducted.

The salient data elicited during the evaluations described in paragraphs (a)(i-vi) shall be integrated into the Patient's treatment plan.

b.    Develop and implement policies and procedures regarding the development of individualized treatment plans consistent with generally accepted professional standards.

c.    Review and revise, as appropriate, each Patient's treatment plan to ensure that it is current and individualized; factors in the Patient's particular strengths; is outcome-driven; emanates from an integration of each discipline's assessments of Patients; ensures that goals and interventions are consistent with clinical assessments; and is revised by KCHC if it is not effective.

d.    Ensure that staff fully involve each Patient in the treatment planning process, to the extent that the Patient is capable of, and willing to, participate in that process.

e.    Ensure that individualized treatment plans are implemented in a consistent manner in accordance with generally accepted professional standards.

f.    Develop and implement policies and practices consistent with generally accepted professional standards to engage Patients, as fully as possible, in psychosocial rehabilitation that:

    (i)       Is based on the individual Patient's assessed needs and is directed toward increasing the individual Patient's ability to engage in more independent life functions;

    (ii)      Has documented objectives, measurable  outcomes, and standardized methodology;

    (iii)    Is aligned with the individual Patient's objectives that are identified in the individual Patient's plan of care, including the treatment plan;

    (iv)    Utilizes the individual Patient's strengths, preferences, and interests;

    (v)       Focuses on the individual Patient's psychiatric risk factors, substance abuse, and re-admission due to relapse, where appropriate;

    (vi)      Is provided in a manner consistent with each individual Patient's cognitive strengths and limitations;

9

(vii)     Documents progress for review by the interdisciplinary team as part of the plan of care, including the treatment plan review process;

(viii)     Is provided 7 days a week, for a minimum of 4 hours each day for each individual Patient and that additional activities designed to enhance the individual Patient's quality of life are offered at, among other times, evenings and weekends, and that takes place as much as practicable in the Patient's language of preference.

(ix)     Is provided to individual Patients in a manner and for a period that is commensurate with their medical status;

(x)     Routinely takes place as scheduled; and

(xi)     Is consistently reinforced by staff on the therapeutic milieu.

To the extent that a Patient declines or resists receiving appropriate psychosocial treatment, KCHC shall make all reasonable efforts to provide the Patient with the services.

g.     Ensure that adequate individualized and group exercise and recreational options are provided, consistent with generally accepted professional standards.

h.     Ensure that, consistent with generally accepted professional standards, family support services are provided where feasible to individuals who have an assessed need for such services, in their language of preference, and that these services, and their impact where ascertainable, for addressing the indicated problem(s), are appropriately documented in each individual Patient's chart.

i.     Ensure that staff educates Patients regarding the purposes of their treatment, rehabilitation and enrichment services and that Patients are informed of the contents of their treatment plan and that Patients and/or their advocates are provided a copy of their treatment plans upon request, as appropriate.

j.     Ensure that clinical staff informs Patients and any advocates or family members of the Patients' choosing orally and, where appropriate, in writing, about their right to informed consent and to refuse treatment and educates Patients orally and, where appropriate, in writing, about their medications, including, but not limited to, reasons for the chosen treatment, the expected results, and the potential common and/or serious side effects of medications, and that clinical staff regularly ask Patients about common and/or serious side effects they may experience.

k.     Ensure that interdisciplinary teams review, assess, develop and implement clinical strategies in accordance with generally accepted professional standards to overcome Patients' barriers to participation in treatment services. Such review shall, where appropriate, take place with the participation of Patients and any advocates or family members of the Patients' choosing.

10

l.    Ensure that the Deputy Executive Director for Behavioral Health Services or his or her designee assesses in a timely manner high-risk situations such as individuals requiring repeated use of restraints. All restraints will be reviewed by the service medical directors. The use of restraints on any Patient more than once during an admission will be reviewed by the Deputy Executive Director for Behavioral Health or his or her designee.

m.    Provide adequate and appropriate psychiatric and other mental health services, including adequate psychological services and behavioral management, in accordance with generally accepted professional standards. Behavioral management should focus on teaching alternative, adaptive behaviors.

n.    Develop and implement psychological evaluations, where indicated, to assess Patients' cognitive deficits and strengths to ensure that treatment interventions are selected based on the Patient's capacity to benefit.

o.    Develop and implement treatment goals that will establish an objective, measurable basis for evaluating Patient progress.

p.    Develop and implement policies to ensure that Patients who are dually diagnosed as mentally ill/developmentally disabled or cognitively impaired or mentally ill/substance abuse, and Patients with behavioral problems, are appropriately evaluated, treated, and receive appropriate services in accordance with generally accepted professional standards.

q.    For Patients identified as suicidal, develop and implement a clear and uniform policy for Patient assessment and treatment.

r.    Ensure that staff receive adequate training to serve the needs of Patients requiring specialized care. Such training shall include, as appropriate:

    (i)    Competence in performing behavioral assessments, including the functional analysis of behavior and appropriate identification of target and replacement behaviors (i.e., existing maladaptive behaviors and the desired substitutes for those behaviors);

    (ii)    Implementation of clear criteria for behaviors or events that trigger referral for a behavioral assessment;

    (iii)    Review of behavioral assessments by treatment teams, including consideration or revision of behavioral interventions, and documentation of the team's review in the Patient's record;

    (iv)    Implementation of protocols for collecting objective data on target and replacement behaviors; and

    (v)    Assessing each Patient's cognitive deficits and strengths to ensure that treatment interventions are selected based on the Patient's capacity to benefit.

11

s.   Ensure that treatment plans address the reasons for repeated admissions by individual Patients and adjust their plans accordingly to examine and address the factors that led to their re-admission, consistent with generally accepted standards.

t.   Develop policies and procedures that provide for the identification of Patients with repeated admissions to the CPEP whose treatment plans will be reviewed by the Deputy Executive Director for Behavioral Health Services or his or her designee.

u.   Ensure that treatment plans are consistently assessed for their efficacy and reviewed and revised when appropriate.

v.   Ensure that the treatment planning process is guided by a multi-disciplinary team in which diverse professional expertise and observations are employed, in an inter-disciplinary process, to evaluate Patients and develop treatment plans.

3.  Medication Management and Monitoring

KCHC shall provide adequate psychiatric supports and services for the treatment of its Patients, including medication management and monitoring of medication side effects in accordance with generally accepted professional standards.  More particularly, KCHC shall:

a.   Ensure that Patients' treatment plans at KCHC include a psychopharmacological plan of care that includes information on the purpose of treatment, type of medication, rationale for its use, target behaviors, and possible side effects.  The plan of care shall also include the time within which the medication should be reconsidered if the intended benefits have not been observed.  KCHC should also reassess the diagnoses in those cases that fail to respond to repeat drug trials.

b.   Develop and implement policies and procedures requiring clinicians to document their analyses of the benefits and risks of subsequent chosen treatment interventions in the Patient's chart.

c.   Ensure that all psychotropic medications are, in accordance with generally accepted professional standards:

(i)   Prescribed in therapeutic amounts and that prescriptions are clinically justified;

(ii)   Tailored to each Patient's individual symptoms;

(iii)   Monitored for efficacy against clearly-identified symptoms, goals, and time frames;

(iv)   Modified based on clinical rationales; and

12

(v)     Properly documented including the informed consent of the Patient when needed, or, for Patients under guardianship, the authorized guardian.

d.    Institute systematic monitoring mechanisms regarding medication use throughout the facility.  In this regard, KCHC shall:

(i)     Develop, implement and maintain an updated and comprehensive set of psychiatric practice guidelines, including but not limited to administration of medications, in accordance with generally accepted professional standards, that address the indications, contraindications, screening and monitoring procedures, dose requirements, and expected outcomes.

(ii)    Ensure that the pharmacological component of a treatment plan reflects the exercise of professional judgment for medication treatment including:  diagnosis, target symptoms, risks and benefits of particular medications, and consideration of alternate treatments.

(iii)   Ensure that the rationale for each Patient's course of treatment is documented by the physician;

(iv)    Ensure that psychotropic medications are used as an integral part of a treatment program to manage specific behaviors in the least restrictive manner, to eliminate targeted behaviors/symptoms, and to treat specific psychiatric disorders;

(v)     Develop and implement policies and procedures governing the use of pro re nata ("PRN" or "as needed") and STAT (emergency) medications, which, among other things, specifically address PRN and STAT uses of psychotropic medications, that includes requirements for specific identification of the behaviors that result in PRN and STAT administration of medications, a time limit on PRN uses, a documented rationale for the use of more than one medication on a PRN and STAT basis, physician documentation to ensure timely, critical review of the Patient's response to PRN and STAT medication administration and re-evaluation of regular treatments as a result of PRN and STAT uses;

(vi)    Not administer medication on a PRN basis over the objection of the Patient;

(vii)   Develop and implement policies and procedures, in accordance with generally accepted professional standards, governing clinical justification of polypharmacy, which should include attention to the special risks associated with the use of benzodiazepines, anticholinergic agents, and conventional and atypical antipsychotic medications. For any use of psychiatric intraclass polypharmacy, the prescribing physician shall provide explicit written treatment rationale for the prescription.  Such use of polypharmacy shall be

13

reviewed promptly by appropriate KCHC managing clinical personnel. Appropriate KCHC clinical personnel shall regularly review polypharmacy policies and procedures;

(viii)   Ensure that all medications, in accordance with generally accepted professional standards, are being prescribed for their specific purpose and not solely for their secondary, sedating effects;

(ix)   Adopt and incorporate the necessary protections and safeguards to ensure that Patients are afforded safe and effective pharmacological treatment. To this end, KCHC shall, at a minimum, establish mechanisms to:

(A)   Monitor practitioners' adherence to specific and current guidelines in the use of each medication;

(B)   Promptly report and timely analyze individual adverse drug reactions; and

(C)   Regularly review with appropriate KCHC clinical personnel patterns of significant adverse drug reactions which cause significant harm, i.e., drug reactions that result in unintended, undesirable, unexpected or excessive responses to medication given at normal doses; and

(D)   Report, analyze, and document actual and potential variations in the prescription, transcription, procurement/storage, dispensing and administration of medications.

C.   <u>Behavioral Management</u>

KCHC shall ensure the use of systematic behavior (social learning) strategies. To this end, KCHC shall:

1.   Ensure that behavioral plans, in accordance with generally accepted professional standards, contain certain basic elements, including:

a.   an analysis of the reasons for the behavior and its frequency and causes;

b.   identification of specific interventions developed and implemented by trained staff in order to address and modify the behavior; and

c.   full integration of the behavioral plan into the Patient's overall plan of care, including the treatment plan.

2.   During the term of this Agreement or any extension of this Agreement, when mechanical restraints are required and medically approved, employ no other restraints than four-point restraints.

14

3. Not employ chemical restraints at any time.

4. Not employ seclusion at any time. Seclusion means the involuntary confinement of a Patient alone in a room or area from which the Patient is prevented from leaving.

5. Develop and implement policies and procedures on the use of restraints that are consistent with generally accepted professional standards. To this end, KCHC shall ensure that:

   a. Restraints are used only when Patients pose an immediate threat to themselves or others and after a hierarchy of less restrictive measures has been exhausted, or after less restrictive interventions have been determined to be ineffective to protect the patient, a staff member, or others from harm. Where a determination is made that less restrictive interventions would be ineffective to protect individuals from harm, that determination and the justification therefor shall be documented.

   b. Restraints are not used in the absence of, or as an alternative to, active treatment, as punishment, or for the convenience of staff;

   c. Restraints are not used as part of a behavioral intervention or behavioral management technique;

   d. Policies and procedures are established regarding limitations on the use of restraints on Patients at risk of harm from restraints, including but not limited to Patients who are obese, have serious respiratory or cardiac problems, have histories of sexual or physical abuse, have serious physical disabilities, or are intoxicated;

   e. Restraints are terminated as soon as the Paatient is no longer an imminent danger to himself or others;

   f. Restraints can be terminated by a nurse without the requirement of a doctor's consent; and

   g. The practices and procedures in subparagraphs (a) through (f) are reliably documented.

6. Ensure that close observation, time-outs, and other procedures that restrict, limit, or direct a Patient's freedom of movement are not used in lieu of other appropriate behavioral management technique and are used in accordance with generally accepted professional standards. To this end, KCHC shall:

   a. Develop clear definitions of "close observation" and the various levels of close observation which are utilized by KCHC and include these definitions in policies and procedures;

   b. Develop and implement a comprehensive policy and procedure that would restrict the use of close observation to only those situations where it is necessary to protect a Patient from self-harm or harm to others;

15

     c.      Ensure that staff successfully complete competency-based training on the correct application of close observation;

     d.      Develop and implement a quality improvement mechanism to monitor the use of close observation;

7.     Create or revise, as appropriate, and implement policies and procedures consistent with generally accepted professional standards that address the following areas:

     a.      The range of restrictive alternatives available to staff and a clear definition of each;

     b.      The training that all staff receive in the prevention and management of the patient crisis cycle (the emergence of disruptive or violent behavior, escalation of that behavior, and return of the Patient to pre-crisis status), of behaviors that result in crises or incidents, the use of restrictive measures, and the use of less-restrictive interventions; and

     c.      Limitations on the use of restraints and STAT medications to address Patient behaviors, consistent with federal and state law requirements.

8.     Ensure that once the use of restraints is initiated, the Patient is assessed within one hour and an appropriately trained staff member makes a determination of the need for continued restraints.

9.     Comply with 42 C.F.R. § 482.13(e) (regarding standards for restraints) and 42 C.F.R. § 482.13(f) (regarding staff training requirements for restraints) as to assessments by a physician or licensed medical professional of any Patient placed in restraints.

10.    Ensure that a psychiatrist's order for restraints includes:

     a.      The specific behaviors requiring the procedure;

     b.      The maximum duration of the order; and

     c.      Behavioral criteria for release, which, if met, require the Patient's release even if the maximum duration of the initiating order has not expired.

11.    Ensure that the Patient's attending psychiatrist is promptly consulted regarding the restrictive intervention.

12.    Ensure that at least every thirty minutes, a Patient in restraints is re-informed of the behavioral criteria for his/her release from the restrictive intervention.

13.    Ensure that when a Patient is placed in restraints, a treatment team promptly reviews the incident, and the attending psychiatrist documents the review and the reasons for or against change in the Patient's current pharmacological, behavioral, or psychosocial treatment. If the team reviewing the restraints is not the Patient's primary treatment team, the Patient's primary treatment team shall promptly conduct such a review.

16

14.     Ensure that staff successfully complete competency-based training regarding implementation of restraints policy and the use of less-restrictive interventions.

15.     Ensure that KCHC will not transfer Patients between psychiatric units in lieu of proper treatment.  To this end, KCHC shall:

     a.     Develop and implement a comprehensive policy and procedure so that the transfer of Patients from one unit to another is not performed in lieu of proper treatment and require that all such transfers be approved by the Deputy Executive Director for Behavioral Health Services or his/her designee;

     b.     Review and assess the necessity of all transfers by members of the treatment teams and the Patient.  In this review, the problem behaviors and effective and ineffective intervention strategies should be discussed and the efficacy of transfer be evaluated.

     c.     Establish policies and procedures to ensure effective communication of critical clinical information before a transfer is made.

## D.     Medical and Nursing Care

KCHC shall provide medical and nursing services to its Patients consistent with generally accepted professional standards.  More particularly, KCHC shall:

1.     Ensure that prior to admission or within 24 hours of an individual's admission to the inpatient service, the individual receives an admission medical assessment that includes:

     a.     A review of systems;

     b.     Medical history;

     c.     Physical examination;

     d.     Diagnostic formulation;

     e.     Management of acute medical conditions; and

     f.     Initial treatment plan.

2.     Ensure adequate clinical leadership to ensure that professional standards of practice are maintained.

3.     Ensure that Patients are provided adequate medical care in accordance with generally accepted professional standards.

4.     Develop and implement appropriate policies and procedures, in accordance with generally accepted professional standards, to ensure adequate medical and nursing assessments and monitoring.

17

5. Ensure that, before they work directly with Patients, all nursing staff have successfully completed competency-based training regarding mental health diagnoses, related symptoms, psychotropic medications, identification of side effects of psychotropic medications, monitoring of symptoms and achievement of targets of treatment, and documenting and reporting of the Patient's status.

6. Ensure that nursing staff monitor, document, and report accurately and routinely Patients' symptoms and the achievement of targets of treatment in a manner that enables treatment teams to assess the Patient's status and to modify, as appropriate, the treatment plan.

7. Ensure that nursing staff actively and effectively participate in the treatment team process and provide feedback on Patients' responses, or lack thereof, to medication and behavioral interventions.

8. Ensure that each Patient's treatment plan identifies:

   a. The diagnoses, treatments, and interventions that nursing and other staff are to implement;

   b. The related symptoms and goals to be monitored by nursing and other unit staff; and

   c. The frequency by which staff need to monitor such symptoms.

9. Establish an effective infection control program to prevent the spread of infections or communicable diseases.

10. Establish an effective program for responding to medical emergencies including appropriate staff training; staff awareness of emergency materials and their location; and conducting sufficient practice code drills to be able to perform in a competent fashion when confronted with an actual emergency.

11. Provide and maintain adequate medical documentation in accordance with generally accepted professional standards. Ensure that all clinical records created on or after the Effective Date and those prepared in the future are complete, accurately documented, readily accessible, and systematically organized; ensure that all clinical records prepared before the Effective Date are complete, accurately documented, readily accessible and systematically organized, to the extent reasonably feasible.

12. Provide 24 hour medical coverage in the CPEP by a physician who is physically present. The physician will also be available for consultation on the inpatient psychiatric unit.

18

E.    Quality Assurance/Performance Improvement

Develop, implement and maintain an integrated system to monitor and ensure quality of care across all aspects of care and treatment, including adequate systems for data capture, retrieval, and statistical analysis to identify and track trends. The program also should include a process for developing a corrective action plan and a process for monitoring the effectiveness of corrective measures that are taken.

F.    Fire and Life Safety

In order to provide Patients with the environmental safety and security that generally accepted professional standards require, KCHC shall, at a minimum:

1.    Develop and implement adequate policies and procedures regarding fire prevention, including emergency planning and drills.

2.    Ensure that emergency drills are conducted on a regular basis and are performed consistent with generally accepted professional standards.

3.    Implement competency based testing for staff regarding fire/emergency procedures.

4.    Develop and implement appropriate documentation and evaluation tools to enable management and staff to document and identify strengths and weaknesses in the fire prevention and life safety programs;

5.    Ensure that emergency keys are appropriately marked, available, and consistently stored in a quickly accessible location.

6.    Develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials.

7.    Develop and implement policies and procedures for disposal of any linens that cannot be sanitized sufficiently to kill any possible bacteria. Inspect and replace all worn linens as often as necessary.

8.    Develop and implement policies and procedures for laundering, disinfecting, and appropriately storing Patients' extra personal clothing until the Patients' discharge.

9.    Ensure that laundry is washed and dried at the proper temperatures and the laundry handling procedures protect Patients from exposure to contagious disease, bodily fluids, and pathogens by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

10.   Develop and implement policies and procedures to ensure adequate cleaning of the facilities with meaningful inspection processes and documentation. Such policies should include oversight and supervision, as well as establish daily cleaning requirements for toilets, showers, housing areas, and other areas accessible to Patients.

11.   Provide training for food service workers in the areas of food safety and food handling to reduce the risk of food contamination and food-borne illnesses.

19

12.     Ensure that foods are served and maintained at proper temperatures.

G.     <u>Discharge And Aftercare Planning</u>

KCHC shall actively pursue the appropriate discharge of Patients and create discharge and aftercare plans designed to satisfy the requirement that Patients receive services in the most integrated, appropriate setting in which Patients reasonably can be accommodated, as clinically appropriate, that is consistent with their needs.  KCHC shall ensure that the discharge and aftercare plan developed for Patients is Patient-driven, recovery-oriented, and is created with the participation of and input from the Patient, (unless the Patient refuses to participate) and, as feasible, any representatives of the Patient's choice.  Discharge and aftercare planning shall be provided consistent with federal law, and to the extent that it has the ability to, KCHC will take appropriate steps, as set forth in paragraph 7 below, so that community placement services are provided consistent with federal law.  Discharge planning shall begin at admission and continue throughout the course of the Patient's hospitalization until the Patient is discharged. More particularly, KCHC will:

1.     Utilize appropriate interdisciplinary discharge planning forms and aftercare instructions, which shall be clearly and precisely explained to the Patient in the person's language of preference, or using appropriate interpretation and translation services.

2.     At admission or as soon as reasonably possible thereafter, identify and address in treatment planning the criteria that likely will foster appropriate discharge for a particular Patient, including but not limited to:

   a.     The individual Patient's symptoms of mental illness or psychiatric distress;

   b.     Any other barriers preventing the individual Patient from transitioning to a more integrated environment, especially difficulties raised in previously unsuccessful placements; and

   c.     Those factors which would likely foster successful discharge, including the Patient's strengths, preferences personal life goals, and support network.

3.     Ensure that, consistent with generally accepted professional standards, each Patient has a professionally developed discharge and aftercare plan that is integrated within the Patient's plan of care, including the treatment plan, that addresses his or her particular discharge considerations, and that includes:

   a.     Measurable interventions regarding these discharge considerations;

   b.     The staff responsible for implementing the interventions;

   c.     The time frames for completion of the interventions;

   d.     A statement of the Patient's need, if any, for supervision, medication, aftercare services, and assistance in finding employment;

20

e.  A specific recommendation of the type of residence in which the Patient is to live and a listing of services and supports available to the Patient in such residence;

f.  A listing of organizations, facilities, and individuals who are available to provide services and supports in accordance with the identified needs of the Patient;

g.  The notification of the appropriate school district and the committee on special education regarding the proposed discharge or release of a Patient under 21 years of age, consistent with applicable federal and state laws relating to confidentiality of such information; and

h.  An evaluation of the Patient's need and potential eligibility for public benefits following discharge, including public assistance, Medicaid, Medicare and Supplemental Security Income, in cooperation with local social service districts.

4.  Include in treatment interventions the development of skills necessary to live in the setting in which the Patient will be placed, and otherwise prepare the Patient for his or her new living environment.

5.  Ensure that, beginning at the time of admission and throughout the individual's stay at KCHC, the Patient is an active participant in the discharge and aftercare planning process, to the fullest extent possible, given the individual's level of functioning.

6.  To the extent that it is able, consistent with paragraph 7 below, ensure that professional judgments about the most integrated setting appropriate to meet each Patient's needs are implemented and that appropriate aftercare services are provided that meet the needs of the Patient in the community.

7.  Provide transition supports and services consistent with generally accepted professional standards. In particular, KCHC shall

a.  Ensure that Patients who have met discharge criteria are discharged expeditiously, subject to the availability of suitable placements;

b.  Provide adequate assistance to individual Patients in transitioning to the new setting;

c.  Take appropriate steps so that there is continuity of care with appropriate community providers in order to minimize the risk of decompensation and reinstitutionalization;

d.  Develop policies and procedures and prepare and cause to be implemented, post-discharge follow-up procedures, including but not limited to case management, designed to:

21

(i)  Determine whether the residence in which the former Patient is living is adequate and appropriate for the needs of such individual;

(ii)  Coordinate with agencies and providers to assure that the services specified in the discharge plan are being implemented, or that alternative clinically appropriate and indicated services are being provided; and

(iii)  Recommend, and, where indicated, take reasonable steps to assure, provision of, alternative services.

Nothing in this section shall be construed to require KCHC to provide such services if the Patient, so long as he or she is competent, chooses not to accept them.

8.  Create or revise, as appropriate, and implement a quality assurance or utilization review process to evaluate the discharge and post-discharge follow-up process.

9.  Develop and implement policies and procedures to address Patients who return to KCHC, either to the CPEP or to an inpatient unit in less than 90 days and/or who have more than three (3) admissions within a calendar year. Such processes shall include the identification of specific factors relating to each Patient's repeated admissions as well as a plan for attempting to address such factors so as to reduce the likelihood of future admissions.

10.  Maintain and analyze data on Patients who return to KCHC, either to the CPEP or to an inpatient unit, in less than 90 days and/or who have more than three (3) admissions within a calendar year. For such patients, KCHC shall develop a plan to address identified factors for each Patient. The plan shall be placed prominently in the patients' chart and shall document the identified factors.

11.  The Defendants shall designate an independent clinical staff member or members to serve as a repeat admissions review coordinator or a committee (the "RARC").

a.  Every Patient admitted with three (3) or more admissions in a twelve month period or more than five (5) total admissions to KCHC shall have a "repeat admissions review" conducted by the RARC or the RARC's staff (if the RARC is an individual) or a designated member of the RARC (if the RARC is a committee), that is consistent with generally accepted professional standards. The review shall, at a minimum, identify barriers to successful discharge, reasons for repeat admissions, and recommended strategies to promote successful discharge;

b.  The findings of the repeat admissions review shall be supplied to the treatment team promptly but no more than seven days after the patient's admission to the inpatient unit;

c.  The treatment team shall consider the findings of the RARC and shall address the findings of the repeat admissions review in writing in the treatment plan, including specific reasons for adopting or rejecting the recommendation made

22

in the repeat admissions review;

d.   Upon request by any treatment team, the RARC will attend the treatment planning meeting to assist with discharge and aftercare planning; and

e.   The RARC shall participate in the quality assurance or utilization review of KCHC's discharge and aftercare process.

H.   KCHC Hospital Police Policies, Procedures and Practices

KCHC shall provide policing services with respect to Patients that comport with the requirements of the United States Constitution and laws, as well as with generally accepted professional standards for peace officers providing hospital security services. To that end, KCHC shall:

1.   Develop and implement a coherent, comprehensive, integrated set of Hospital Police policies and procedures that provides clear guidance for officer conduct, including but not limited to policies to guide Hospital Police officers' interactions with Patients and Hospital Police officers' use of force;

2.   Develop and implement a comprehensive training program, including adequate field training for new officers and adequate in-service training for all officers, that is appropriately documented and reviewed by supervisory and command personnel;

3.   Develop and implement comprehensive policies and procedures and training on supervisory oversight of line officers, including supervisory and command review of use of force and other incidents that involve hospital police intervention or enforcement actions;

4.   Establish an adequate record management system whereby all incidents involving the Hospital Police, including but not limited to uses of force, as well as all other types of interactions with Patients, are documented, recorded, and assigned discrete control numbers;

5.   Develop and implement a coherent and comprehensive set of policies and procedures regarding the duties of Behavioral Health Associates ("BHAs"), including but not limited to policies to guide BHAs' interactions with Patients and to deploy BHAs to interact with Patients. BHAs shall perform, as part of the clinical team and in addition to their clinical functions, safety and security duties in all psychiatric units, including the CPEP. BHAs shall, among other things, be trained to perform CPR and shall be supervised in performing this function by the Department of Nursing. The BHAs will not wear police uniforms, and will not be armed with any weapon or tool regularly employed for law enforcement purposes by individuals having peace officer or police officer status, including but not limited to batons of any nature;

6.   Develop and implement policies defining those events which require a formal investigation. Establish: time requirements for conducting such investigations; protocols for supervisory and command review; and procedures for appropriate recording and documentation of interviews of police personnel, clinical or other staff, and other parties whose statements might be relevant to said investigation; and

23

7.    Ensure that Hospital Police perform only law enforcement duties; Hospital Police shall not participate in physical or chemical restraints of Patients in clinical situations and, in particular, shall not restrain Patients in order for the Patients to be medicated. Nothing in this paragraph shall be construed to restrict the Hospital Police's legitimate law enforcement responsibilities.

I.    Training and Policy Manuals and Accountability

The Defendants shall require all staff to successfully complete competency-based training necessary to implement the terms of this Agreement. Such training shall, where appropriate, be ongoing and/or include regular in-service refresher training to ensure continued competency. KCHC also shall develop, maintain and regularly update comprehensive policies and practice manuals in accordance with generally accepted professional standards for all clinical staff. In addition, KCHC shall develop and implement policies and procedures to ensure staff accountability.

## IV. IMPLEMENTATION OF AND COMPLIANCE WITH THIS AGREEMENT

The Defendants shall implement all reforms necessary to effectuate this Agreement. The implementation of this Agreement shall begin immediately upon the Effective Date.

A.    Within two weeks of the Effective Date, the Defendants shall communicate the provisions set forth in this Agreement to KCHC officials, employees, agents, and independent contractors involved in providing care to the Patients at KCHC.

B.    The Defendants shall comply with all federal and State licensing requirements applicable to the KCHC.

C.    The Defendants shall ensure that Patients admitted prior to the Effective Date of this Agreement and still hospitalized at KCHC are afforded all of the requirements provided by this Agreement.

D.    The Defendants shall appoint a Settlement Agreement Coordinator at KCHC to oversee compliance with this Agreement and to serve as a point of contact for the United States during review of compliance with this Agreement. The Settlement Agreement Coordinator shall provide DOJ with reports regarding compliance with this Agreement. With the reports, the Settlement Agreement Coordinator will provide the raw data upon which the compliance reports are based, along with any reports prepared by the Defendants' technical consultants regarding compliance with this Agreement and any other reports routinely submitted to the point of contact regarding compliance with this Agreement. KCHC shall provide such reports and data to DOJ and the subject matter experts (described in section G. below) 45 days before each DOJ site visit to KCHC. If DOJ provides KCHC less than 45 days' notice of a site visit, the Settlement Agreement Coordinator shall provide reports regarding compliance no less than 14 days before the site visit. If less than 45 days' notice is provided, the parties will work out a reasonable schedule for the production of documents.

E.    Within 45 days of the Effective Date of this Consent Judgment, the Defendants shall provide the United States with a plan of correction agreement ("POCA") to implement the provisions of the Consent Judgment. The POCA shall set forth specific goals, objectives, and tasks to be completed to implement the provisions of the Judgment; target and deadline dates for

24

implementation of goals, objectives, and tasks; and compliance assessment methods and requirements to ensure compliance with the POCA and the Judgment in a timely and effective manner.

1.   The POCA shall also designate persons responsible for oversight and implementation of tasks outlined in the POCA.

2.   The POCA shall set forth specific data to be collected and maintained and identify reports from such data to be provided to the United States and the subject matter experts.

3.   The POCA shall set forth any additional reports regarding Defendants' compliance with this agreement that will be provided to the United States and the subject matter experts.

4.   If the United States has any objection to the POCA, it will provide its objections and recommended modifications to the POCA within two weeks of receipt of the POCA from the Defendants. If the POCA states with respect to any area that KCHC will develop a policy or procedure with respect to a particular area covered by the POCA, the United States will have two weeks from the date of establishment of the specific policy or practice to object or comment. The parties shall have two weeks to resolve any disagreements regarding the POCA after the United States provides its objections and recommended modifications. If they are unable to reach agreement, the Court will resolve the dispute. The parties agree that minor or *de minimis* differences in the terms of the POCA will not be brought before the Court. However, regardless of the terms of the POCA, Defendants shall nonetheless be responsible for substantially complying with the terms of this Agreement, as provided herein.

5.   All policies and procedures developed in accordance with this Agreement shall be considered part of the POCA. The POCA, once finalized, shall be considered part of this Consent Judgment.

G.   Compliance with this Agreement shall be assessed by a team of subject matter experts selected by the United States (the "compliance review team"). Defendants and MHLS shall have input on the composition of the compliance review team. Defendants shall bear all reasonable fees and costs of the subject matter experts on the compliance review team. The parties recognize the importance of ensuring that the fees and costs borne by the City are reasonable, and accordingly, fees and costs will be one factor considered in selecting the expert consultants. In the event that any dispute arises regarding the payment of the experts' fees and costs, the parties will attempt to resolve such dispute cooperatively. If they are unable to reach agreement, the Court will resolve the dispute.

H.   The parties acknowledge that conditions at KCHC are the subject of a lawsuit filed by Mental Hygiene Legal Service of New York State, Hirschfeld o/b/o L.D. et al. v. New York City Health and Hospitals Corp., et al., Civil Action No. CV-07-1819 (KAM) (E.D.N.Y.). This lawsuit challenges conditions of confinement at KCHC similar to many of the conditions found to exist in the United States' investigation, and that this Agreement is designed to remedy. Accordingly, the Parties shall raise no objection if MHLS elects to use the same subject matter experts to assess compliance with its own agreement with the City, at its own expense. To the extent that any agreement between MHLS and the City calls for review of

25

matters other than those identified in this Agreement, the experts shall prepare separate reports regarding those matters.

I.    In the event that MHLS elects to employ the same subject matter experts on its compliance review team that compose the compliance review team for this Agreement, the United States will coordinate efforts with MHLS to ensure, to the extent practicable, that the experts' reports are consolidated.

J.    In order to assess the Defendants' implementation of each substantive provision of this Agreement, the compliance review team will conduct regular compliance reviews to ensure that Defendants have implemented and continue to implement all measures required by this Agreement. The first compliance review will be conducted approximately three months from the Effective Date. Thereafter, compliance reviews will be conducted approximately every six months, unless the United States determines that a different schedule is appropriate, until this Agreement is terminated. The compliance review team will prepare a report to the United States and a consolidated report which will be provided to the Defendants.

K.    For the purpose of ascertaining compliance with this Agreement, the compliance review team, the United States and its attorneys, subject matter experts and agents shall have reasonable access to:  all of the relevant KCHC buildings and facilities; relevant KCHC documents and records; relevant KCHC officials, employees, agents, and independent contractors; and KCHC Patients, including the right to meet with Patients privately. Such access shall continue until this Agreement is terminated in accordance with the termination provisions herein. Within 30 days of receipt of written questions from the United States concerning the Defendants' compliance with the requirements of this Agreement, the Defendants shall provide the United States with written responses and any requested documents. The Defendants shall provide copies of all documents reasonably requested by the United States without charge.

L.    The United States and the compliance review team shall provide the Defendants with technical assistance designed to help the Defendants achieve substantial compliance with the Agreement.

M.    The Defendants shall notify the United States immediately of serious incidents as defined in III.A.6. The Defendants shall forward to the United States copies of all incident reports and final reports of investigations related to such incidents, as well as any autopsies, mortality reviews, and death summaries.

N.    The Parties and all of their agents shall, to the fullest extent allowed by law, maintain the confidentiality of Patients' medical and personal information. All non-public information obtained by the United States shall be maintained in a confidential manner.

The provision of any confidential and/or privileged materials to the United States pursuant to this Agreement shall not constitute or be construed as a waiver of confidentiality or a waiver of any privilege by HHC, the City of New York or any City agency, including their officials, employees, representatives and agents, or the successors or assigns of any of the foregoing.

O.    To evaluate compliance with § III.G. above, the United States might visit community placements to which Patients of KCHC have been or may be discharged. The Defendants shall assist in facilitating the visits to such community placements.

26

P.    In addition to the involvement of MHLS in the selection of the compliance review team in this case as set forth in Section G. above, throughout the term of this Agreement, the Parties shall consult with MHLS regarding the status of the Defendants' compliance with this Agreement.  Specifically, the parties agree that:

    1.    The Defendants shall provide MHLS with access to all documents and materials provided to the United States or to the compliance review team in connection with the assessment of compliance with this Agreement;

    2.    MHLS will be given an opportunity to comment and provide input into the assessments made by the United States and/or the compliance review team towards the determination of substantial compliance with this Agreement.

Q.    MHLS shall be entitled to provide information to the United States that it believes in good faith is relevant to the instant action or the City's compliance with this action.

## V. MODIFICATION AND TERMINATION

A.    If, at any time, any party to this Agreement desires to modify it for any reason, that Party shall notify all other Parties to this Agreement, in writing, of the proposed modification and the reasons therefor.  If the Parties reach agreement on the requested modification, it shall be reduced to writing, signed, and filed with the Court for approval.

B.    With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of Patients, during the term of this Agreement, if the United States believes that the Defendants have failed to fulfill any obligation under this Agreement, the United States shall, before initiating any court proceeding to remedy such failure, give written notice of the failure to the Defendants setting forth the basis for its conclusion, including specific findings in the subject matter experts' compliance assessment reports, if any, and any data, documents or reports supporting the determination such a belief is based upon.

    1.    With the exception of an immediate or serious threat to life, health, or safety of Patients served by the facilities, the Defendants shall have 30 days from the date of such notice to cure the failure and provide the United States with sufficient proof of its cure or a plan to cure the failure and proof of implementation of that plan.  If the Parties agree that modification of this Agreement is required to cure the failure, the modification shall be reduced to writing, signed, and filed with the Court for approval. The Parties shall attempt to resolve any differences regarding the identified non-compliance during this period.

    2.    If the parties cannot resolve any such differences within the thirty-day cure period, the United States may move this Court for an order enforcing the provisions of this Agreement. The United States shall bear the burden of proving that the alleged non-compliance is systemic.

    3.    If the parties agree to a plan to cure an alleged violation and the United States believes that the violation has still not been cured, the United States must provide at least thirty (30) days notice before any motion is made for enforcement of this Agreement.

C.  In the event that conditions or practices at KCHC appear to pose an immediate and serious threat to the life, health, or safety of Patients confined to those facilities, and, as a result, the United States believes that the Defendants have failed to fulfill any obligation under this Agreement that could mitigate such threat, the notice and cure provisions outlined in the preceding paragraph shall not apply to any court action initiated by the United States.

D.  This Agreement shall terminate five years after the Effective Date of this Agreement, if the United States certifies at that time that the Defendants have maintained Substantial Compliance with all provisions of this Agreement for the previous twelve months. "Substantial Compliance" indicates that the Defendants have achieved compliance with most or all requirements of the relevant provisions of the Agreement. Any alleged noncompliance must be systemic. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, intermittent compliance during a period of sustained noncompliance shall not constitute substantial compliance.

E.  This Agreement may terminate prior to the five year date if the United States certifies that the Defendants have substantially complied with each of the provisions of the Agreement and have maintained Substantial Compliance for at least two years. The burden shall be on Defendants to demonstrate this level of compliance.

F.  If, after the end of the five year period described in Section D. above, the United States determines that Defendants are not in Substantial Compliance, and Defendants dispute that determination, Defendants may move for relief from this Court. Defendants may also move for termination if the United States takes no action at the end of the five year period. In any such motion, Defendants shall bear the burden of demonstrating that they are in Substantial Compliance as set forth in section D above.

G.  Notwithstanding the provisions of paragraphs D through F above, that portion of this Agreement regarding the KCHC Hospital Police, set forth above at Section III.H., may terminate if the United States certifies that the Defendants have maintained Substantial Compliance with the requirements of that section for two years, regardless of whether the United States has certified that KCHC has maintained Substantial Compliance with respect to the other provisions of this Agreement.

H.  In the event that Defendants believe that they have maintained Substantial Compliance with some of the requirements of this Agreement, the parties agree to discuss the possibility of requesting that the Court release defendants from the requirements of those portions with which Defendants have maintained Substantial Compliance. Defendants recognize that the United States is not required to agree to such a release and that one basis for not agreeing to such a release may be that the various portions of this Agreement are inextricably intertwined.

I.  Forty-five months after the Effective Date of this Agreement, the Court will conduct a status conference regarding the Defendants' compliance with this Agreement. At this status conference, the Court will entertain requests for supplemental relief with respect to any area where it appears to the United States that the Defendants may not attain substantial compliance with the Agreement within five years of the Effective Date. If the United States believes that the Defendants have failed to fulfill any obligation under this Agreement, the

28

United States shall, no less than 30 days before the status conference, give written notice of the failure to the Defendants setting forth the basis for its conclusion, including specific findings in the subject matter experts' compliance assessment reports, if any, and any data supporting the determination.

## VI. GENERAL PROVISIONS

A.  This Agreement is enforceable only by the Court and the Parties and is binding upon the Parties, by and through their officials, agents, employees, assigns, and successors.

B.  The Defendants agree that they shall not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation of the KCHC or in proceedings related to this Agreement. The Defendants agree that they shall timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and the non-retaliation provision of CRIPA, and take any necessary corrective actions identified through such investigations.

C.  "Notice" under this Agreement shall be provided by electronic mail and overnight delivery and shall be provided as follows to: Martha Calhoun, Esq. and Emily Sweet, Esq., New York City Law Department, 100 Church Street, New York, New York 10007.

D.  If an unforeseen circumstance occurs that causes a failure to timely fulfill any requirement of this Agreement, the Defendants shall notify the United States in writing within 20 calendar days after the Defendants become aware of the unforeseen circumstance and its impact on the Defendants' ability to perform under the Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The Defendants shall take all reasonable measures to avoid or minimize any such failure.

E.  Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines and provisions of this Agreement.

F.  The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court or administrative challenge to this Agreement within a time period sufficient for the other party to act in response to that challenge. In the event any provision of the Agreement is challenged in any city or state court, the Parties agree to seek removal to federal court. In the event any provision of the Agreement is declared invalid, for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

G.  Notwithstanding the requirement that no modification to this Agreement will occur unless there is written Agreement by all Parties, to the extent any other federal authority, statute, or regulation amends, supercedes, or modifies this Agreement, this Agreement shall be amended, superceded, or modified accordingly.

H.  This Agreement shall constitute the entire integrated agreement of the Parties. With the exception of the United States' findings letter referenced in paragraph I.B., no prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions in this Agreement.

29

I. Each party shall bear the cost of their fees and expenses incurred in connection with this case, except as provided in paragraph IV.G.

FOR THE UNITED STATES:

_____
BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

_____
THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

_____
SAMUEL BAGENSTOS
Deputy Assistant Attorney General
Civil Rights Division

_____
MICHAEL J. GOLDBERGER
Chief of Civil Rights
Civil Division
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-6052

_____
TAMMIE M. GREGG
Principal Deputy Chief
Special Litigation Section

_____
DAVID DEUTSCH
CATHLEEN TRAINOR
LAURA M. WELP
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-6270

30

FOR DEFENDANTS:

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
100 Church Street, Room 2-110
New York, New York 10007

By: _____
       MARTHA A. CALHOUN
       EMILY SWEET
       (212) 788-0923

                    SO ORDERED THIS
                    DAY OF Jan 7 , 2010

                    _____
                    HON. KIYO A. MATSUMOTO
                    UNITED STATES DISTRICT JUDGE